[No. S014036. Nov. 30, 1992.]

PRUDENTIAL REINSURANCE COMPANY, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JOHN GARAMENDI, as Insurance Commissioner, etc., Real Party in
Interest.

1120

## COUNSEL

Adams, Duque & Hazeltine, Robert M. Mitchell, Margaret Levy, John L. Viola, Vicki W. W. Lai, F. Christopher Chrisbens, Wilson, Elser, Moskowitz, Edelman & Dicker, Patrick M. Kelly, Thomas R. Manisero, Blanc, Gilburne, Williams & Johnston, Gary R. Klouse, John A. Kronstadt, Sidley & Austin, Peter R. Chaffetz, Janet M. Letson, Hoon Chun, Mendes & Mount, Valerie A. Gordon, LeBoeuf, Lamb, Leiby & MacRae, Sanford Kingsley, Hufstedler, Miller, Kaus & Beardsley, John P. Olson, Arnold & Porter, Daniel M. Lewis & Gary P. Poon for Petitioner.

Bryan, Cave, McPheeter & McRoberts, Martin J. Foley, Phillip E. Stano, Daniel J. Conway, Richard E. Goodman, Jack H. Blaine, Craig A. Berrington, Ronald S. Gass and John J. Nangle as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Rubinstein & Perry, Karl L. Rubinstein, Kathleen M. McCain, Melissa S. Kooistra, Dana Carli Brooks, John K. Van de Kamp and Daniel E. Lungren,

Attorneys General, Edmond B. Mamer, Jack T. Kerry and Raymond B. Jue, Deputy Attorneys General, for Real Party in Interest.

Horvitz & Levy, Ellis J. Horvitz, Barry R. Levy, Lisa Perrochet, Spiegel & McDiarmid, Richard A. Brown, Spencer L. Kimball, Cynthia S. Bogorad, Diane J. Lautrup, Jeffrey R. Babbin, Hugh Alexander and Charles E. Erdmann II as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**LUCAS, C. J.**—Insurance Code section 620 (all further statutory references are to this code unless otherwise stated) defines a reinsurance contract as "one by which an insurer procures a third person to insure him against loss or liability by reason of such original insurance." Typically, under a reinsurance contract, the primary insurer "cedes" a portion of the premiums for its policies, and the losses on those policies, to the reinsurer.

In a reinsurance transaction, policyholders pay premiums to their original insurer, who, in turn, pays a reinsurer a percentage of the initial premiums as consideration for reinsuring a specified part of the original risk. If, after a loss, the original insurer must compensate its policyholders, the reinsurer in turn indemnifies the insurer. The advantage of reinsurance is to secure to the original insurer adequate risk distribution by transferring a portion of the risk assumed to another insurer. (Semple & Hall, *The Reinsurer's Liability in the Event of the Insolvency of a Ceding Property and Casualty Insurer* (hereafter Semple & Hall) (1986) 21 Tort & Ins.L.J. 407 ["A reinsurance agreement is one by which the reinsurer indemnifies the ceding company for losses paid"].)

We granted review to determine as a matter of first impression whether reinsurance debts and credits generated between a reinsurer and the original insurer, under the terms of their reciprocal reinsurance contracts, may be set off pursuant to section 1031, when the original insurer becomes insolvent. Section 1031 provides in pertinent part that: "In all cases of mutual debts or mutual credits between the person in liquidation under Section 1016 and any other person, such credits and debts shall be set off and the balance only shall be allowed or paid. . . ."

Section 1031 allows the setoff of all mutual debts and credits in the course of liquidation proceedings and is patterned after the federal Bankruptcy Act of 1898 (11 U.S.C. § 108, repealed and reenacted as 11 U.S.C. § 553), and an identical New York statute that has been adopted by several states (N.Y.

Ins. Law, former § 420 (Consol. 1985), recodified as § 7427). The federal and New York provisions were in turn derived from the equitable right of setoff established in 17th century England, and later adopted in early federal court cases allowing equitable setoff in the insurance context. (*Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323, 335-336 [227 P.2d 484]; see also *Scammon* v. *Kimball* (1876) 92 U.S. (2 Otto) 362 [23 L.Ed. 483] [allowing banker to setoff insolvent insurer's deposits against unrelated insured losses].)[1]

Assuming setoff is permitted, there remain questions pertaining to the relative priorities of setoff and other claims in liquidation against the insurer. An exception to the general rule of section 1031 is provided in section 1031, subdivision (a) (hereafter section 1031(a)), which does not allow setoff when the "obligation of the person in liquidation to such other person does not entitle such other person claiming such setoff to share as a claimant in the assets of such person in liquidation." Accordingly, we must also consider whether section 1031(a) allows setoff claims if the estate has insufficient assets to satisfy fully all primary policyholders and claims of the California Insurance Guarantee Association (CIGA) whose claims, absent setoff, have priority (under section 1033) over those of reinsurers and other general creditors.[2] Because reinsurers are not considered priority claimants in an insolvency proceeding, the amount of setoff money remaining after priority claimants are paid would be less than that available before statutory preference is given to other claimants.

We conclude that section 1031 may not reasonably be construed as conditioning a reinsurer's right to set off on the insolvent insurer's ability to

---

[1]Although the federal government has the power to regulate insurance as part of interstate commerce (*U.S.* v. *Underwriters Assn.* (1944) 322 U.S. 533 [88 L.Ed. 1440, 64 S.Ct. 1162]), Congress has declined to exercise that power, leaving insurance regulation to the states. (*Ibid.*; McCarran-Ferguson Act (1976) 15 U.S.C. §§ 1011-1015; see also 11 U.S.C. § 109 [exempting insurers from Bankruptcy Act].) As part of our state's insurance regulatory scheme, our Legislature adopted section 1031 in 1935.

[2]Section 1033, subdivision (a), lists the priority of claims in liquidation in pertinent part as follows:

"1. Expense of administration.

"2. Unpaid charges due under the provisions of Section 736.

"3. Taxes due to the State of California.

"4. Claims having preference by the laws of the United States and by laws of this state.

"5. All claims of the California Insurance Guarantee Association . . . and associations or entities performing a similar function in other states, together with claims for refund of unearned premiums and all claims of policyholders of an insolvent insurer that are not covered claims.

" . . . . . . .· . . . . . . . . . . . . . . .

"6. All other claims. . . ."

As discussed below, we conclude the statutory right of setoff is independent of section 1033 priorities.

pay in full the claims of those in higher priority classes. As we explain, the majority of state and federal courts addressing the statutory right of setoff adopt this position. Thus, we hold that the reciprocal reinsurance contracts at issue here created "mutual credits and debts" under section 1031.

We also conclude that section 1031(a) does not preclude setoff in this case. Plaintiff reinsurer has shown a contractual and legal entitlement to the status of creditor of the insolvent insurer, and the contract between the two entities does not make setoff contingent on the ultimate financial ability of the original insurer or its estate to first pay all claimants in higher priority classes.

Finally, we determine that any policy considerations favoring payment of insureds under original policies may not override the unequivocal language of section 1031 or policies favoring setoff. To disallow setoff in this case would not only subvert clear legislative intent, but would also lead to an increased cost of insurance for the consumer, because offsetting an insurer's debts spreads the risk incurred by the insurer and often allows smaller insurers to remain in business. (See *Stamp* v. *Insurance Co. of North America* (7th Cir. 1990) 908 F.2d 1375, 1380 [offsetting debts spreads risk and acts as mutual security for performance].)

## I. Background

On February 2, 1982, the Commissioner of Insurance (Commissioner) placed Mission Insurance Company (Mission) and its affiliated insurance companies into conservatorship due to insolvency. (§ 1011, subd. (d) [vesting title to assets in Commissioner when insurer's transaction of business is hazardous to policyholders].) Several weeks later, the Commissioner obtained an order pursuant to section 1016, authorizing liquidation of the Mission companies. The Commissioner was appointed liquidator, and thereafter demanded all reinsurers of Mission pay in full the amounts owed under their reinsurance contracts. The reinsurers refused to make any such payments, claiming that under section 1031, they were entitled to set off the amounts owed by Mission for reinsurance proceeds and "unearned premiums" (or amounts insureds prepaid for coverage in the days and months ahead), owed to them by the insolvent insurers, against the debts they owed the insolvent insurers under reinsurance contracts executed prior to insolvency. The Commissioner commenced the underlying action against 144 reinsurers, and brought the present summary judgment motion against petitioner Prudential Reinsurance Company (Prudential Reinsurance) to compel payment, without setoff, of moneys owed the Mission companies.

The trial court granted the Commissioner's summary judgment motion on the ground that section 1031 allows a setoff only when the assets of the

liquidating estate are sufficient to pay in full all the claims asserted by claimants in priority classes higher than the claimant asserting the setoff right. In other words, the court concluded that section 1031 makes the statutory right of setoff contingent on the ultimate financial ability of the liquidation estate to pay in full all claimants in section 1033 priority classes higher than the setoff claimant.

The Court of Appeal followed the rule of every state and federal court that has considered the reinsurer's right to statutory setoff and issued a peremptory writ of mandate ordering the trial court to vacate its order granting summary judgment and to enter a new order allowing Prudential Reinsurance the right of setoff. The Commissioner seeks our review of this judgment.

As we explain, we adopt the thoughtful analysis of the Court of Appeal and conclude that a plain reading of sections 1031 and 1033 allows an insolvent insurer and a reinsurer to set off debts and credits after the appointment of a liquidator. Because we agree with the Court of Appeal that Prudential Reinsurance is entitled to set off Mission's debts, we affirm the Court of Appeal's judgment.

## II. Discussion

### A. *The Reinsurance Contracts*

■ Reinsurance contracts, as contracts of indemnity, operate to shift a part of the risk of loss under the insurance policy from the original insurer to the reinsurer. (1 Cal. Insurance Law & Practice, Reinsurance (1991) § 11.01, pp. 11-6, 11-7.) The insured, however, remains in privity with the original insurer, and the reinsurer owes no duties to the insured. (*Ibid.*) Thus, the original insured has no right to pursue contract or bad faith actions against the reinsurer. (§ 623; *Ascherman* v. *General Reinsurance Corp.* (1986) 183 Cal.App.3d 307, 310 [228 Cal.Rptr. 1].)

Reinsurance contracts are classified as either "facultative" or "treaty." Reinsurance is facultative if it covers the reinsured's risk on an individual policy. The majority of reinsurance contracts are placed under a treaty, which covers the reinsured's risk for an entire class of policies. (1 Cal. Insurance Law & Practice, *supra*, § 11.02, at p. 11-22.)

In the present case, Prudential Reinsurance is the reinsurer under 14 reinsurance treaties. The parties refer to these treaties as "Relation A" contracts; these contracts reinsure the Mission companies. The other reinsurance contracts at issue here are called "Relation B" contracts and reinsure

Prudential Reinsurance and its subsidiary, Gibraltar, as principals. Mission is the reinsurer under all but one of these latter contracts; a related company, Mission National Insurance Company, is the reinsurer under the remaining contract.

The setoff clauses of the "Relation A" contracts provide in substance that Mission, other named Mission subsidiaries (as reinsureds), and Prudential Reinsurance (as reinsurer) agree that the parties thereto may offset any and all reinsurance debts owed by or to them "under the same or any other reinsurance agreement between them." Some of the clauses acknowledge that in the event of insolvency of a party thereto, setoff rights are controlled by section 1031. Similarly, the "Relation B" contracts also grant Prudential Reinsurance the express right to set off moneys due from Mission against amounts due Mission under the same or any other reinsurance contract between them. Keeping this background in mind, we now turn to the issues before us.

## B. *Mutuality*

As noted above, in 1935 the Legislature granted a statutory right of set-off under section 1031 "in all cases of mutual debts or mutual credits." ▆ The key to setoff is the requirement of mutuality. Justice Benjamin Cardozo defined mutuality as follows: "To be mutual, [the debts] must be due to and from the same persons in the same capacity." (*Beecher* v. *Peter A. Vogt Mfg. Co.* (1920) 227 N.Y. 468 [125 N.E. 831, 833]; see Marick et al., *Excess, Surplus Lines and Reinsurance: Recent Developments* (1991) 26 Tort & Ins. L.J. 231, 244.) Later cases required that the subject debts be mutual in three respects. First, the debts must be owed contemporaneously with, or prior to issuance of, the liquidation order. In other words, preinsolvency debts may be set off, but a preinsolvency debt may not be set off against a debt arising after appointment of a liquidator. (See, e.g., *Stamp* v. *Insurance Co. of North America, supra,* 908 F.2d at p. 1379; *Downey* v. *Humphreys, supra,* 102 Cal.App.2d at p. 336.)

Next, such debts must exist between the same persons or entities in order to establish mutuality of identities. (*Matter of Midland Ins. Co.* (N.Y. 1992) 79 N.Y.2d 253 [582 N.Y.S.2d. 58, 590 N.E.2d 1186, 1192] (hereafter *Midland*); *Harrison* v. *Adams* (1942) 20 Cal.2d 646, 649-650 [128 P.2d 9].) Finally, the setoff can occur only between persons or entities of equal capacity; debts owed in a fiduciary, agency, trustee, or partnership capacity are not subject to setoff. (*Downey* v. *Humphreys, supra,* 102 Cal.App.2d at p. 336; *Midland, supra,* 590 N.E.2d at pp. 1192-1193; see also *Garrison* v. *Edward Brown & Sons* (1946) 28 Cal.2d 28, 30 [168 P.2d 153].)

The Court of Appeal found all three requirements were met in the present case, and that the reciprocal reinsurance contracts created "mutual credits and debts" under section 1031 as between Prudential Reinsurance and Mission. The court also concluded that section 1031 permits setoff when the reinsurer shows legal status as a creditor of the insolvent insurer, and does not make the statutory right of setoff contingent on the ultimate financial ability of the insolvent entity to first pay all claimants (including original insureds and CIGA) in higher priority classes under section 1033. The court concluded that favoring payment of the insureds under original policies and CIGA was contrary to the plain meaning of section 1031. As explained below, we agree with the Court of Appeal that mutuality was established in this case.

### 1. *Contemporaneous Mutuality*

■ The Commissioner first contends the reinsurance obligations between Prudential Reinsurance, its subsidiary, Gibraltar, and Mission did not meet the contemporaneous requirement for mutuality, because the debts owed by the reinsurers to Mission (namely, payments on insured losses) are postliquidation debts, while those owed to the reinsurers by Mission (namely, past-due premiums) are preliquidation debts. The Commissioner reasons that the reinsurance proceeds and the return of policy premiums may not be set off because those debts are postliquidation debts that will not be due until the policyholders' loss claims are allowed or liquidated. As the Court of Appeal herein observed, however, the Commissioner's assertion is not supported by section 1031 or case law.

Prior to the enactment of sections 1031 and 1033 in 1935, California and federal decisions addressing the common law doctrine of equitable setoff held that debts and credits of an insolvent insurer amounted to mutual obligations for purposes of equitable setoff even if the obligations were technically not payable until closing of the insolvency estate.

For example, in *Carr v. Hamilton* (1889) 129 U.S. 252 [32 L.Ed. 669, 9 S.Ct. 295], the court held that once the insurer is declared insolvent, proceeds due the insured must be offset against the insured's separate mortgage debt to the insurer. The *Carr* court applied the principle of offset, initially established in federal bankruptcy law, to the insurance liquidation context and held that debts due between the insolvent insurer and other persons may be set off during insolvency even if they were otherwise due at a later date. The *Carr* decision was based on the premise that any contractual creditor of the insurer in liquidation should be allowed to set off mutual debts created by contract before the insolvency occurred. (See also *Scammon v. Kimball*,

*supra*, 92 U.S. at p. 371 [23 L.Ed. at p. 486]; *Ainsworth* v. *Bank of California* (1897) 119 Cal. 470, 474-476 [51 P. 952] [in analogous context of estate administration, mutual debts between deceased and a bank may be set off against executor as long as debts existed prior to death].)

In *Downey* v. *Humphreys, supra,* 102 Cal.App.2d 323, the court addressed the statutory right of setoff under sections 1031 and 1033, as originally adopted in 1935. In that case, an independent insurance agent wrote an insurer's policies for payment of policy premiums. After an insolvency receivership order was issued against the insurer pursuant to section 1011, the agent set off all premiums due the insurer against claims due policyholders. The agent also retained funds due as earned commissions up to the date of the insolvency. Thereafter, the liquidator demanded that the agent pay to him all premium amounts for the newly written policies, less earned commissions which were routinely set off. The agent claimed that the initial policy premiums became "unearned premiums" because the insolvency order effected a breach of those policies by the insurer.

After the trial court allowed the setoff, the Court of Appeal affirmed on the ground that the agreement between the agent and the insurer that their cross-claims should mutually compensate each other, established the necessary relationship between the parties—that of debtor and creditor—to permit the setoff. (*Downey* v. *Humphreys, supra,* 102 Cal.App.2d at pp. 335-336.) In so holding, the *Downey* court reasoned that, "At the time [the insurer] was adjudicated insolvent, April 19, 1933, and at the time the liquidator was appointed, June 28, 1933, the statute providing for proceedings against delinquent insurance companies was silent as to the right of setoff. (Stats. 1919, p. 265, as amended Stats. 1933, p. 1420.) In 1935 the statute was amended to provide for setoff of mutual debts and mutual credits. (Stats. 1935, p. 544.) The statute was based on the New York law and was but the enactment of the prevailing rule. [Citations]. The Bankruptcy Act provides for a setoff of mutual debts and mutual credits. (11 U.S.C.A. § 108.)" (*Downey, supra,* 102 Cal.App.2d at p. 335.)

"A receiver occupies no better position than that which was occupied by the party for whom he acts. . . . The right [of setoff] is to be determined by the condition of things as they existed at the moment the party was adjudged insolvent. If the right of setoff was available to defendant at that time, the insolvency of [the insurer] did not defeat it. [Citations.] The fact that the policyholders received their unearned premiums did not create an unlawful preference." (*Downey* v. *Humphreys, supra,* 102 Cal.App.2d 335-336; see also *O'Connor* v. *Insurance Co. of North America* (N.D.Ill. 1985) 622 F.Supp. 611, 619 [accord].)

The Commissioner asserts that even under *Downey* v. *Humphreys, supra,* 102 Cal.App.2d at pages 335-336, setoff must be disallowed if the debts were not debited and credited prior to the appointment of a liquidator. The *Downey* court made it clear, however, that the liquidator succeeds to the insolvent insurer's interest in assets, subject to legislatively imposed limitations existing against the insolvent prior to the liquidation. (*Ibid.*)

Although California courts have not addressed the statutory right of setoff since *Downey* in 1951, other jurisdictions have more recently discussed the issue, and we look to them for guidance. For example, in *O'Connor* v. *Insurance Co. of North America (O'Connor), supra,* 622 F.Supp. 611, the court considered the issue whether debts owed under reciprocal reinsurance contracts between a reinsurer and an insolvent insurer are subject to a right of setoff under an Illinois statute that is substantially similar to the right granted under section 1031.

The *O'Connor* court addressed the requirement of contemporaneous mutuality under the Illinois Insurance Code which provides, inter alia, that debts "between the company and another company" would be subject to setoff as long as the debts were mutual. (Ill.Rev.Stat. ch. 73, § 818 (1983).) In *O'Connor,* the liquidator of an insolvent insurer asserted that debts owed to it involving reinsurance proceeds, as well as unearned premiums that followed the cancellation of the policies on insolvency of the insurer, amounted to post-liquidation debts that could not be set off by the debts owed by the insolvent insurer to the reinsurers, because those debts amounted to preliquidation debts. The *O'Connor* liquidator concluded that mutuality did not exist when the reinsurers' debts were postliquidation debts, whereas the insolvent insurers' debts were preliquidation debts. (*O'Connor, supra,* 622 F.Supp. at p. 618.)

Like the courts in *Carr* v. *Hamilton, supra,* 129 U.S. 252, and *Downey* v. *Humphreys, supra,* 102 Cal.App.2d 323, the *O'Connor* court relied on bankruptcy law in rejecting the liquidator's contention. The court observed, "Even if the Liquidator is correct in his assertion that the debts for reinsurance proceeds and unearned premiums were not due at the time of liquidation, that fact has no bearing on whether Defendants may use these debts for set-off purposes. 'The right of set-off may be asserted in the bankruptcy proceedings even though at the time the petition is filed one of the debts involved is absolutely owing but not presently due, or where a definite liability has accrued but is as yet unliquidated.'" (*O'Connor, supra,* 622 F.Supp. at p. 618, quoting from 4 Collier on Bankruptcy (14th ed. 1978) ¶ 68.10[2].)

Finally, the *O'Connor* court concluded that the reinsurers and the insolvent insurer "entered into a reinsurance contract which defined all of the

parties' rights and obligations. Any liability [the insolvent insurer] may incur to pay reinsurance proceeds or return unearned premiums or ceding commissions arises as a result of provisions in the previously executed reinsurance agreement that require them to make these payments." (*O'Connor, supra,* 622 F.Supp. at pp. 618-619.) The court held that because the reinsurance contracts existed prior to the insolvency, the reinsurer's debts were "provable" under the Bankruptcy Act and became payable on the date of insolvency. Hence, the court determined that the reinsurance debts were preliquidation debts that satisfied the Illinois Insurance Code's contemporaneous mutuality requirement. (*O'Connor, supra,* 622 F.Supp. at p. 619.)

The Commissioner in the present case attempts to distinguish the *O'Connor* holding. In *O'Connor,* all claims giving rise to the insurer's liability were filed prior to the insolvency order. By contrast, the Commissioner observes, in the present case, the "vast majority" of the reinsurance obligations arose after the liquidation order, and therefore the debts could not be mutual.

As the Court of Appeal explained, however, the *O'Connor* court determined that mutuality depends on whether the *debts* were in existence before insolvency, not whether individual *claims* arose before the date of insolvency. Thus, if the reinsurance debts arose from contracts executed prior to the date of liquidation, debts arising from those contracts are considered preliquidation debts subject to setoff. (See also *Ainsworth* v. *Bank of California, supra,* 119 Cal. 470.)

The *O'Connor* view of contemporaneous debt is shared by *Stamp* v. *Insurance Co. of North America, supra,* 908 F.2d 1375, in which the court approved the setoff of debts owed by an insolvent insurer to a reinsurance pool. Initially, the *Stamp* court observed, "The Bankruptcy Code does not apply to insurance companies. 11 U.S.C. § 109(b)(2), (d). Like most other states, Illinois handles the failure of insurers in state court under the supervision of the state's chief regulator, who takes title to the firm's assets as trustee and liquidator." (*Id.* at p. 1377.) In approving the setoff, the *Stamp* court found that the requirement of contemporaneous mutuality had been met. The court noted, "A debt may exist even though it has not been valued conclusively and even though there is a bona fide dispute about the obligation to pay. [Citation.] This is the usual understanding about mutuality." (*Id.* at p. 1380.)

In an attempt to diminish the authority of *O'Connor,* Justice Kline's dissent herein asserts "*O'Connor* proceeds on the unstated assumption, legally incorrect and illogical, that setoff must be allowed because it is

permitted." (Dis. opn., *post*, at p. 1167.) To the contrary, *O'Connor*'s reasoning with respect to setoff has been endorsed in subsequent decisions.

First, rather than reject *O'Connor*'s reasoning, the Northern District Court in Illinois denied the liquidator's motion to reconsider *O'Connor* in *O'Connor* v. *Insurance Co. of North America* (N.D.Ill. 1987) 668 F.Supp. 1183. In so doing, the court observed that there is "also a significant policy reason for upholding [the *O'Connor* decision]. [The reinsurer] has a right to the benefit of its reinsurance contracts, which defined the parties' rights and liabilities with respect to the monies in dispute. Reinsurance contracts are construed in accordance with general principles of contract law, including an implied duty [of] good faith. . . . Once the reinsured goes into liquidation, the purpose of the reinsurance agreements is vitiated. The reinsured's liability on the policies ceases, and the reinsurer is bound to return unearned premiums and, presumably, any other form of consideration to which it is not entitled. . . . Any other result would not be in accordance with what the parties must have intended upon entering into the reinsurance contracts." (*Id.* at p. 1186 [denying motion for reconsideration].)

In addition, as noted above and contrary to the dissent herein, the *Stamp* court followed the *O'Connor* holding in allowing reinsurers to exercise their statutory setoff rights. (*Stamp* v. *Insurance Co. of North America, supra*, 908 F.2d at p. 1380.) Again, Justice Kline's dissent misreads the applicable law.

This dissent criticizes the *O'Connor* court's reliance on Professor Collier's 1978 treatise for the proposition that federal bankruptcy law recognizes that "one creditor may be getting paid more than other creditors" (*O'Connor, supra*, 622 F.Supp. at p. 619). The criticism is misplaced. Contrary to the dissent, Collier's 15th edition treatise states the exact principle almost verbatim. (4 Collier on Bankruptcy (15th ed. 1992) ¶ 553.02, p. 553-12.) In addition, Collier recognizes that "In permitting setoff . . . Congress wisely has hedged the privilege granted under the [federal bankruptcy] Code with certain stated qualifications, [namely, recently forbidding preferences occurring 90 days before filing of insolvency] so as to prevent abuse." (*Ibid.*) As Justice Kline's dissent herein later observes, the "qualifications" noted by Collier and outlined by Bankruptcy Code section 553 (11 U.S.C. § 553) are not applicable in this case.[3]

Based on the foregoing, we reject the Commissioner's contention that the reinsurance obligations between Prudential Reinsurance and Mission were not contemporaneous preliquidation debts subject to setoff.

---

[3]Following oral argument, counsel for the Commissioner requested the court consider *Foster* v. *Mutual Fire Ins.* (1992) __ Pa. __ [614 A.2d 1086] (hereafter *Foster*). We have read the case and conclude it is not persuasive. Contrary to section 1031, the setoff statute at issue in *Foster* expressly prohibits reinsurer setoff of premium obligations. (*Foster, supra*, __ Pa. at p. __ [614 A.2d at p. 1096].)

### 2. *The Insolvency Clause*

■ Section 922.2 requires all reinsurance contracts to contain an "insolvency clause" allowing the liquidator to collect from the reinsurer the amount that would have been due if the ceding company had not become insolvent. The insolvency clause in this case states in pertinent part that "reinsurance provided by each and every reinsurance agreement heretofore or hereafter entered into by and between the parties hereto shall be payable by the Reinsurer directly to the Company or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a portion of any claim. . . ."

In a very recent case addressing statutory setoff and the requirement of mutuality, the New York Court of Appeals upheld a reinsurer's statutory right of offset against an insolvent insurer. (*Midland, supra,* 590 N.E.2d 1186.) As plaintiff's counsel observe, the *Midland* case is of particular significance because section 1031 was modeled after the New York setoff statute at issue. (N.Y. Ins. Law, § 7427 (Consol. 1985); see *Downey* v. *Humphreys, supra,* 102 Cal.App.2d at pp. 335-336; see also *State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1162 [252 Cal.Rptr. 221, 762 P.2d 385] [statute patterned after Texas statute given same construction as Texas courts].)

The *Midland* court was faced with the issue whether a reinsurer could offset amounts it was owed by Midland under separate reinsurance contracts at the time Midland was placed into liquidation. The liquidator objected to the setoff on the grounds that the debts were not mutual, the insolvency clause contained in one of the contracts prevented setoff, and the debts were not owed to and from the same person.

The New York Court of Appeals allowed the setoff under New York Insurance Law section 7427, subdivision (a). In addressing the liquidator's argument that the insolvency clause contained in one reinsurance contract prevented the offset, the court observed that "[a]lthough reinsurance contracts are indemnity contracts, they commonly contain insolvency clauses which, even in the absence of a primary insurer's payment to policyholders, permit a liquidator to collect from the reinsurer the amount of reinsurance proceeds that would have become due if the ceding company had not become insolvent. The [offset] statutes encourage such clauses by providing that unless the reinsurance contract contains an insolvency clause the primary insurer may not consider the reinsurance as an asset or claim a

deduction for the amount ceded [see section 922.2]. The loss of those rights is substantial because if the primary insurer must maintain reserves in the full amount of reinsurance ceded, one of the primary reasons for obtaining reinsurance is defeated." (*Midland, supra,* 590 N.E.2d at pp.1188-1189.)

The Commissioner relies on *Melco System* v. *Receivers of Trans-America Ins. Co.* (1958) 268 Ala. 152 [105 So.2d 43], to contend that the insolvency clause destroys contemporaneous mutuality and, hence, prevents setoff because it requires payment of reinsurance recoverables "without diminution because of insolvency." In addition, Justice Kline's dissent herein interprets section 922.2 as requiring any money due the insolvent insurer to be paid to the liquidator without any subtraction notwithstanding Prudential Reinsurance's contractual right to offset Mission losses prior to insolvency. As explained below, both the Commissioner and Justice Kline's dissent misunderstand the purpose of the insolvency clause.

The *Melco* court held that a reinsurer was not entitled to set off unpaid premiums due from the insolvent, because the insolvency clause in reinsurance contracts requires payment of proceeds *after* insolvency, when the clause becomes operative. (*Melco, supra,* 105 So.2d at p. 53.) Both Prudential Reinsurance and the Court of Appeal herein correctly point out that the *Melco* analysis is inapposite.[4]

As *Midland, supra,* observed, statutory provisions comparable to section 922.2 that require an insolvency clause in reinsurance contracts were "enacted in response to the Supreme Court's decision in *Fidelity & Deposit Co.* v. *Pink* (1937) 302 U.S. 224. . . . That case held, based on the language of the reinsurance contract and consistent with the indemnity nature of reinsurance contracts in general, that a reinsurer need only reimburse the liquidator of the insolvent ceding company for losses actually paid by the ceding company or the liquidator to the insureds on the underlying policies (see, *Fidelity & Deposit Co.* v. *Pink, supra*). [The statutory insolvency clause] was intended to overcome that decision by altering the indemnity nature of a reinsurance contract when the ceding company becomes insolvent. . . . Pursuant to the statute, if the contract contains a statutory insolvency clause, the reinsurer is obligated to pay the liquidator his or her allocated share of any losses due under the reinsurance contract even though the insolvent ceding company has not first made payment to the insureds on the underlying policies. Nothing in the language of [the statutory insolvency clause] or

---

[4]The Commissioner also cites *Bluewater Ins. Ltd.* v. *Balzano* (Colo. 1992) 823 P.2d 1365 to support his argument that section 922.2 defeats a reinsurer's statutory right to offset. As the *Midland* court observed, however, *Bluewater* dealt with a common law right to offset. The Colorado Supreme Court distinguished the case from cases involving the statutory setoff rights which specifically allow offsets in insurance liquidation proceedings. (*Midland, supra,* 590 N.E.2d at p. 1192, fn. 4.)

its history, however, supports the conclusion that the statute was enacted to destroy a reinsurer's [statutory] right of offset." (*Midland, supra,* 590 N.E.2d at pp. 1191-1192.)

Thus, as noted above, the purpose of section 922.2 and the insolvency clause is to provide the liquidator with the same rights and obligations of the insolvent insurer pursuant to the terms of the reinsurance contract. Certainly, the setoff in this case does not shield the reinsurers from paying reinsurance obligations directly to the liquidator or allow the reinsurer to walk away fully compensated, leaving policyholders and other more favored creditors holding the bag. Indeed, no "dimunition because of insolvency" will occur in light of this setoff.

Therefore, section 922.2 does not conflict with section 1031; rather, it simply prevents the reinsurer from refusing to pay valid claims "on the grounds that its obligation was to indemnify the reinsured against loss, and that the reinsured only incurred loss in the amount of the diminished payments" made by the liquidator. (1 Cal. Insurance Law & Practice, *supra,* § 11.05(6)(c) at p. 11-52; Semple & Hall, *supra,* 21 Tort & Ins. L.J. 407; *American Re-Insurance Co.* v. *Insurance Com'n, Etc.* (C.D.Cal. 1981) 527 F.Supp. 444, 452.).

*Melco, supra,* 105 So.2d 43, did not discuss the effect of an insolvency setoff statute, and the case is contrary to California, federal and sister state law. (See *Downey* v. *Humphreys, supra,* 102 Cal.App.2d 335-336; *O'Connor, supra,* 622 F.Supp. at p. 619 [rejecting *Melco*]; *Midland, supra,* 590 N.E.2d at pp. 1191-1192.) As the *O'Connor* court observed, the *Melco* court erroneously believed that "to allow the offset would give a preference to the reinsurer over other creditors because the reinsurer would be receiving full payment on its claim while other creditors would receive only fractional payment. . . . It is true that the reinsurer would be paid in full if a set-off is permitted, but, of course, that is the case *anytime* a set-off is permitted. The whole point of the statutory set-off section is to make clear that such actions are permissible, even though one creditor may be getting paid more than other creditors." (*O'Connor, supra,* 622 F.Supp. at p. 619, italics in original.)[5]

In a related context, Justice Kline's dissent herein suggests the statutory setoff scheme was not intended to be used to create a preference for reinsurers over other creditors of the insolvent insurer. (See dis. opn., *post,* at

---

[5] The *Melco* decision has questionable effect on the issues before us because in 1971, 13 years after *Melco* was decided, the Alabama Legislature enacted a *statutory* right of setoff substantially identical to that of section 1031. (Ala. Ins. Code § 27-32-29 (1986).)

pp. 1157-1158.) Such reasoning begs the question when reinsurers' rights are not statutorily subordinate because there is a setoff statute (§ 1031) that specifically allows setoff in insurer liquidation proceedings.

In refuting the liquidator's argument that statutory setoff ignores bankruptcy priorities, *Midland* observed that although "permitting offsets may conflict with the statutory purpose of providing for the pro rata distribution of the insolvent's estate to creditors, the Legislature has resolved the competing concerns and recognized offsets as a species of lawful preference. Indeed, if an offset is otherwise valid, there would seem to be no reason why its allowance should be considered a preference: it is 'only the balance, if any, after the set-off is deducted which can justly be held to form part of the assets of the insolvent.' " (*Midland, supra,* 590 N.E.2d at p. 1191, quoting *Scott* v. *Armstrong* (1892) 146 U.S. 499, 510 [36 L.Ed. 1059, 13 S.Ct. 148].)

Finally, Justice Kline's reliance on *Corcoran* v. *Ardra Ins. Co., Ltd.* (2d Cir. 1988) 842 F.2d 31, for the proposition that we should "enhance the power of the Commissioner of Insurance, as liquidator, to protect [policyholders] against overreaching reinsurers" is misplaced. (Dis. opn., *post,* at pp. 1155-1156.) The *Corcoran* decision simply affirmed an order of the United States District Court for the Southern District remanding the action to state court for a determination of remedies available to the parties under their reinsurance contracts after a liquidation order had been entered. Nowhere does the case suggest that the liquidator's appointment affects a creditor's substantive right of offset. (See also *Midland, supra,* 590 N.E.2d at p. 1192, fn. 5.)

### 3. *Mutuality of Identity and Capacity*

 The Commissioner next asserts that the order of liquidation destroyed the debtor-creditor relationship between the Mission companies and Prudential Reinsurance. According to the Commissioner, as a result of the liquidation order, the reinsurance debts are owed to the Commissioner as a trustee for the benefit of the Mission companies, and are no longer owed to Mission; there is no mutuality because the trustee has no contractual obligation to Prudential Reinsurance. We agree with the Court of Appeal, and find the Commissioner's contention without merit.

As the Court of Appeal observed, section 1031 broadly frames its mutuality criterion in terms of "all cases of mutual debts or mutual credits between the person in liquidation under section 1016 *and any other person* . . . ." (Italics added.) It is well settled that once insolvency has occurred and a liquidator has been appointed to assume all the rights of the insolvent

insurer, he does so subject to *all* legal defenses and setoffs to which the insolvent was subject at the time of insolvency and liquidation orders. (§ 1031.) In other words, the liquidator steps into the shoes of the insolvent insurer, taking the relevant claims and defenses as he finds them. The liquidator's appointment does not disrupt the status of mutual debts at the time the liquidation order is issued. (*Downey* v. *Humphreys, supra,* 102 Cal.App.2d at pp. 335-337.) Therefore, the Commissioner's construction of section 1031 would never permit an offset because appointment of the liquidator would always effect a change in the parties, and always transform debts owed to the insolvent insurer, as trustee for the insolvent's creditors. This reasoning would nullify section 1031.

■ In concluding that mutual credits and debts arising from mutual reinsurance contracts may permit section 1031 setoffs in insurance liquidation proceedings, the Court of Appeal limited application of the setoff doctrine to true contractual debtor-creditor relationships between principal insurers. In doing so, it rejected Prudential Reinsurance's assertion that its subsidiary, Gibraltar, should be permitted to set off debts owed by Prudential Reinsurance under the "Relation A" contracts even though Gibraltar is not a party to those contracts. The Court of Appeal concluded that because Gibraltar does not owe reinsurance proceeds or premiums to the Mission companies as a principal reinsurer under the "Relation A" contracts, it has no mutual credits or debts with those companies upon which Prudential Reinsurance may claim a section 1031 setoff against what it owes to Mission as their reinsurer.

The Court of Appeal also observed that because Prudential Reinsurance was reinsured by Mission and by Mission National Insurance Company, but not other Mission companies, the remaining Mission companies are not principal reinsurers having mutual reinsurance debts and credits with Prudential Reinsurance.

We agree with the Court of Appeal. Accordingly, we refuse to expand the section 1031 setoff of debts in the absence of an express mutual agreement that the subsidiary would be deemed a mutual debtor-creditor of the parent. (See, e.g., *In re Berger Steel Company* (7th Cir. 1964) 327 F.2d 401; *Black & Decker Mfg. Co.* v. *Union Trust Co.* (1936) 53 OhioApp. 356 [4 N.E.2d 929].) We conclude that such an unwarranted expansion of the setoff doctrine would permit an exponential increase in the amount subsidiaries could set off to the detriment of liquidation estates.

C. *Section 1031(a)*

■ As discussed above, under section 1031(a), no setoff is allowed when the "obligation of the person in liquidation to such other person does

not entitle such other person claiming such setoff to share as a claimant in the assets of such person in liquidation." The Commissioner construes this subdivision as conditioning the right of setoff on the insolvent insurer's ability to satisfy all obligations that are superior to its own in favor of the party asserting the setoff. Under the Commissioner's interpretation of the statute, Prudential Reinsurance is "entitled" to share in the assets of Mission only if Mission has satisfied its obligations to all claimants superior in priority to Prudential Reinsurance under section 1033. (See fn. 2, at p. 1124, *ante.*) In other words, unless the estate has sufficient assets—after collection of all debts owed to it, without allowance of setoffs—to pay all priority claimants in full, no setoff claimant who is a member of the lower-priority ranks may take any estate assets by way of its section 1031 setoff claim. According to the Commissioner, such a taking would be in effect an unauthorized preference.

The Court of Appeal rejected this argument, concluding that under the Commissioner's construction, a claimant's right to assert a setoff cannot be determined until all the insolvent's assets have been marshalled and the claims of all superior classes have been submitted. As the Court of Appeal observed, "entitlement" under section 1031(a) should be considered independently of Mission's obligations to other claimants. If Prudential Reinsurance is owed a debt that satisfies the requirements of mutuality, it is "entitled" to share in Mission's assets. (§ 1031(a).)

The Commissioner now contends that the Court of Appeal erred in so interpreting section 1031(a) because a claimant asserting the right of setoff must already be a creditor of the insurer in liquidation. According to the Commissioner, if the claimant is a creditor, it is ipso facto entitled to share in the assets of the insolvent, and section 1031(a) is simply redundant.

As the Court of Appeal observed, however, if we were to adopt the Commissioner's proffered construction of section 1031(a), the statutory provision would be nullified because "setoffs would essentially be permitted only in cases where the estate is sufficient to pay higher priority classes in full and most likely be sufficient to also pay the setoff claimant in full without resort to setoff. [¶] If the Legislature had meant to gear setoff entitlement to the estate's financial capacity, we presume it would have worded [s]ection 1031 to make that intention sufficiently clear."

Finally, the Commissioner's assertion that the Legislature, when it amended section 1033 priorities in 1979 to create the separate priority ranks, intended to protect original policyholders from diminution of their loss recoveries due to setoffs by lower priority claimants, is contravened by

legislative history. When sections 1031 and 1033 were enacted (Stats. 1935, ch. 145, pp. 544-545), section 1033 referred to three classes of claimants only—original policyholders, CIGA, and reinsurers all shared the same priority that was classified under "all other claims." Accordingly, if the Legislature intended to deny setoff unless there were sufficient assets to satisfy the claims of all claimants in higher priority classes, that result would have been made explicit in the statute. In sum, section 1031(a) is nothing more than a restatement of the mutuality requirement that is a prerequisite to the assertion of a section 1031 setoff.

### D. *Public Policy and Equitable Considerations*

The Commissioner's final contention is that considerations of public policy and equity should preclude reinsurers' right to set off debts they claim to be owed by the Mission companies. The Commissioner claims the allowance of a setoff permits reinsurers to obtain complete satisfaction of the debt they are owed, while Mission policyholders are relegated to partial satisfaction only. This result, he claims, subverts the recovery scheme expressly adopted by the Legislature and codified in section 1033, which, as discussed above, generally ranks the claims of policyholders superior to the claims of other insurers. To this specific argument, he adds the more general one that it is unfair that policyholders—as opposed to reinsurers—bear the lion's share of Mission's insolvency, while implying even more broadly that the entire business of reinsurance was developed to permit original insurers to avoid their obligations to California policyholders.

██ CIGA, as amicus curiae in support of the Commissioner, asserts that allowing reinsurers to exercise their setoff rights ignores specific language in section 1033 that expressly denies them priority. CIGA relies on an exception to section 1033 discussed below.

Ranked fifth in section 1033, subdivision (a) priority, after expense of administration, certain unpaid charges, taxes, and claims entitled to federal preference, are "(5) All claims of the California Insurance Guarantee Association . . . and associations or entities performing a similar function in other states, together with claims for refund of unearned premiums and all claims of policyholders of an insolvent insurer that are not covered claims. . . ." Ranked sixth and last are "All other claims." A subparagraph of the fifth rank provides, in addition, that "Claims excluded by paragraph [ ] (3) (except claims for refund of unearned premiums) . . . of subdivision (c) of section 1063.1 . . . shall be excluded from this priority." Paragraph 3 of subdivision (c) of section 1063.1 provides, inter alia, that " '[c]overed claims' shall not include any obligations of the insolvent insurer arising out

of any reinsurance contracts. . . ." CIGA claims that the exclusion provision of section 1033, subdivision (a)(5) is evidence of the Legislature's express intention that a reinsurer's claim to the insolvent's assets be ranked inferior to the claims of policyholders.

Such a conclusion, however, is clear without reference to section 1033, subdivision (a)(5). A reinsurer's claim is not a claim of CIGA or of an association or an entity performing a similar function, or any otherwise uncovered claim asserted by a policyholder of the insolvent. To the extent the reinsurer submits a claim for a refund of unearned premiums, that claim is not subject to the exclusion. Accordingly, the apparent exclusion of a reinsurer's claim from subdivision (a)(5) effects no substantive change: that claim was already within the residual sixth rank—"All other claims."

It is true that the claims of policyholders are generally entitled to priority over the claims of reinsurers. Nonetheless, the Legislature has created an exception to the general rules of priority in situations in which the claimant and the insolvent have mutual debts; that exception is codified in section 1031. We cannot ignore its broad mandate.

In a related context, the Commissioner and Justice Kline's dissent assert that because the doctrine of setoff is based on equitable principles, it should be denied when it would "harm the public." As we explain, there is no evidence that the section 1031 setoff "harms the public" and the cases on which Justice Kline and the Commissioner rely to support their arguments are distinguishable.

First, in *Federal Deposit Ins. Corp.* v. *Bank of America* (9th Cir. 1983) 701 F.2d 831 (hereafter *Federal Deposit*), the court disapproved a setoff of a debt similar to the reinsurance debts under consideration in this case. In *Federal Deposit*, a Puerto Rican chartered bank issued a subordinated capital note to the Bank of America, which sought to set off the insolvent's deposits with the Bank of America against the balance due on that note. It was held that the law of Puerto Rico controlled and that no setoff was permissible because the subscription note was expressly subordinated to general creditors of the insolvent. The setoff clause was invalid under Puerto Rican law but the transaction was nevertheless improperly approved by the Puerto Rican Secretary of the Treasury.

In deciding the case under Puerto Rican law, the *Federal Deposit* court observed that the portion of the subordinated capital agreement that provided there shall be no waiver of the right of setoff, violated the language of the Puerto Rican statute and regulations promulgated under it. The court stated,

" 'capital notes shall be subject *in right* to the obligations with the depositors and other creditors of the issuing bank.' " (*Federal Deposit, supra*, 701 F.2d at p. 839, quoting P.R. Laws Ann. tit. 7, § 111(o), original italics.) The court noted that the regulation clarifies this restriction, providing: " 'The capital notes shall be subordinate *in all rights* to the bank's liabilities to its depositors, liabilities under bankers acceptances and letters of credit, and any other current obligations characteristic of banking operations.' " (*Id.* at pp. 839-840, quoting P.R.R. & Regs. tit. 4, No. 4, original italics.)

The Court of Appeal herein rejected the reasoning of *Federal Deposit* because it concerned Puerto Rican law without any reference to the statutory right of setoff or to section 1031, and because the setoff discussion focused on analogous stock subscription debts, which are not allowed in California. (§ 1031, subd. (c); *Kaye* v. *Metz* (1921) 186 Cal. 42, 49 [198 P. 1047].) We agree with the Court of Appeal that *Federal Deposit* is inapposite.

The Commissioner and Justice Kline's dissent also rely on *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 266], in which a bank exercised its setoff right under Code of Civil Procedure former section 440 (cross-demands for money) against a depositor's checking account that consisted of payments for unemployment compensation and state disability benefits, which had been deposited in the account and comprised the depositor's only source of income. We held that the depositor's unemployment and disability benefits were protected from setoff by the bank. In so doing, we rejected the "assumption that a creditor's right of setoff is absolute except when explicitly limited by statute." (*Kruger, supra*, at p. 368.) We based our reasoning on the settled rule that a creditor is not allowed to set off a debt against exempt property, and that unemployment compensation and disability benefits are such property. (*Ibid.*) We concluded that the "legislative objective in providing unemployment compensation and disability benefits—to furnish the unemployed worker and his family with a stream of income to defray the cost of their subsistence—would obviously fail if creditors could seize that income and apply it to past debts." (*Id.* at p. 370.) As the Court of Appeal observed, *Kruger* is materially distinguishable from the present matter. (See also *Bluewater Ins. Ltd.* v. *Balzano, supra*, 823 P.2d 1365 [equitable setoff disallowed when proscribed by statute].)

*Kruger* was decided on the basis of a public policy of protecting those who require welfare and disability benefits for their subsistence, and it was those benefits that were taken by setoff. (See also *Jess* v. *Herrmann* (1979) 26 Cal.3d 131, 142 [161 Cal.Rptr. 87, 604 P.2d 208] [setoff of cross-judgments for comparative fault injuries disallowed on public policy

grounds].) By contrast, in the present case, original insureds have no interest or right in a contract of reinsurance (§ 623), and no rights against the reinsurer (§ 922.2).

The Commissioner and Justice Kline also assert the insolvency statutes were adopted to protect the interests of policyholders and the public in general and setoff would abrogate that protection. Such is not the case. As *Midland* observed, "An important reason offset has been recognized as desirable is that it provides a form of security to insurers." (*Midland, supra,* 590 N.E.2d at p. 1191.) Offsetting debts not only spreads risk but also acts as mutual security for performance. "Such security is especially important for smaller insurers; if the large firms could not count on the netting of balances to satisfy obligations, they would be more likely to exclude smaller or tottering firms—making new entry harder and precipitating failures of firms in difficulty. . . . If . . . one member fails the other members' exposure becomes the gross rather than the net obligation, then the mutual security of the offsetting debts is destroyed. [Reinsurance] become[s] less useful; the premium charged to bear risk will rise." (*Stamp* v. *Insurance Co. of North America, supra,* 908 F.2d at p. 1380.)

Finally, Justice Kline's dissent charges us with favoring reinsurers over insureds in an economic contest over the limited resources in the estate of an insolvent insurance carrier. We plead not guilty. The reinsurers prevail in this case because our Legislature has expressly and broadly recognized their right of setoff, along with the similar right of others who have dealt with insolvent carriers. Our conclusion in this respect is in accordance with those of the United States Court of Appeals for the Seventh Circuit and the New York Court of Appeals, both of which have construed statutory schemes similar to ours. In contrast, the dissent would employ what it labels equitable considerations to favor "invariably unsophisticated" policyholders over "highly sophisticated" reinsurers.

We do not perceive the issue to be one of relative levels of commercial sophistication. Nor is it one that calls for judicial favoritism of one group of claimants over another on supposed "equitable" grounds having nothing to do with the historic concerns of equity jurisprudence in this area. Instead, the issue is one calling for construction of a comprehensive broadly phrased statute permitting setoff and admitting no exception for reinsurance relationships. The types of economic arguments made by the dissent are best addressed to the Legislature. "[W]e are unwilling to engage in complex economic regulation under the guise of judicial decisionmaking." (*Harris* v. *Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1168 [278 Cal.Rptr. 614, 805 P.2d 873].)

## III. Conclusion

Once the Commissioner declared Mission insolvent, Prudential Reinsurance had a legal, statutory right to set off unearned premiums against the amount it owed Mission. The mere fact that a liquidator was appointed did not impair or affect that right. Accordingly, we affirm the Court of Appeal's judgment.

Panelli, J., Arabian, J., and Baxter, J., concurred.

**KENNARD, J.,** Dissenting.—I concur in Justice Kline's excellent dissenting opinion. I write separately, however, to make one additional point: the majority's interpretation of Insurance Code section 1031 renders part of that statute meaningless, contrary to accepted principles of statutory construction.

Insurance Code section 1031[1] (section 1031) gives creditors of insurers in liquidation a general right of setoff subject to specified exceptions. The first paragraph of section 1031 states that, as between the insolvent insurer and any other person, mutual debts and credits shall be set off except in the situations described in subdivisions (a), (b), and (c). Only subdivision (a) of section 1031 is relevant here.

Subdivision (a) of section 1031 prohibits a setoff if the entity claiming the setoff is not entitled "to share as a claimant in the assets" of the insolvent insurer. In other words, only those entities that are entitled to share in the insolvent insurer's assets may exercise the right of setoff. What, then, does the statute mean by an entitlement "to share as a claimant in the assets" of the insolvent insurer?

According to the majority, subdivision (a) of section 1031 means only that a reinsurer (or any other party seeking to exercise a setoff) must possess a claim against the insolvent insurer. The reinsurer does not, under the majority's view, have to actually receive, or share in, any portion of the insolvent insurer's assets. As the majority readily acknowledges, this interpretation

---

[1]Section 1031 states in full: "In all cases of mutual debts or mutual credits between the person in liquidation under Section 1016 and any other person, such credits and debts shall be set off and the balance only shall be allowed or paid, *but no set-off shall be allowed in favor of such other person where any of the following facts exist:* [¶] *(a) The obligation of the person in liquidation to such other person does not entitle such other person claiming such set-off to share as a claimant in the assets of such person in liquidation.* [¶] (b) The obligation of the person in liquidation to such other person was purchased by, or transferred to, such other person. [¶] (c) The obligation of such other person to the person in liquidation is to pay an assessment levied against such other person or to pay a balance upon a subscription for shares of the capital stock of the person in liquidation." (Italics added.)

makes subdivision (a) merely a restatement of the conditions of setoff—that is, the existence of "mutual debts and credits" between the insolvent insurer and the party seeking to exercise a setoff. As the majority puts it, "In sum, section 1031(a) is nothing more than a restatement of the mutuality requirement that is a prerequisite to the assertion of a section 1031 setoff." (Maj. opn., *ante*, p. 1139.) Under the majority's view, subdivision (a) of section 1031 is redundant and superfluous.

The majority's conclusion violates these precepts of statutory construction: to give independent meaning and significance whenever possible to each word, phrase, and sentence in a statute (see, e.g., *Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323]); to avoid an interpretation that makes any part of a statute meaningless (*id.* at p. 1387; accord, *Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 45]; *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]); and to harmonize statutes both internally and with each other (*Woods* v. *Young, supra,* at p. 323).

It is not necessary, as the majority has done, to read subdivision (a) of section 1031 as having the identical meaning as the general rule to which it is an exception. There is, as the Insurance Commissioner correctly notes, another construction of section 1031 that gives independent meaning and purpose to subdivision (a) and harmonizes section 1031 both internally and with other components of the statutory scheme. Under this construction, subdivision (a) bars setoff by those entities that have claims against the insolvent insurer but do not actually share in the insolvent insurer's assets.

Reading section 1031 this way gives its words—particularly the phrase "to share as a claimant in the assets"—their ordinary and traditional meaning. It recognizes that subdivision (a) prohibits setoffs in a clearly defined situation. Finally, it harmonizes section 1031 both internally and, as ably demonstrated by Justice Kline (dis. opn., *post*, pp. 1145-1150), with the statutory scheme of which it is a part. In brief, this reading of section 1031 is preferable to the majority's when judged by the neutral criteria traditionally used for statutory construction. I perceive no sound basis for rejecting it.

Mosk, J., concurred.

**KLINE, J.,*** Dissenting.—The majority's allowance of setoff—which elevates the economic interests of reinsurers over the legislatively preferred and

---

*Presiding Justice, Court of Appeal, First Appellate District, Division Two, assigned by the Acting Chairperson of the Judicial Council.

equitably superior rights of policyholders, injured claimants and other creditors—results from a fundamental misunderstanding of the insurance insolvency statutes and contravenes clear legislative intent.

Permitting reinsurer setoff will result in the disallowance of many justifiable claims and have a ruinous effect on many individual policyholders, who reasonably believed they were protected against injury. As a consequence, policyholders, injured claimants and the public will bear costs of insolvency that the Legislature intended to impose, and which would much more fairly be imposed, on reinsurers, which were paid to assume the risk of the insolvency they are now unconscionably permitted to turn to their advantage. The majority opinion will also discourage self-regulation within the industry and exacerbate the growing problem of insurance insolvency now plaguing this nation.

## I.

The majority says that "[t]he reinsurers prevail in this case because our Legislature has expressly and broadly recognized their right of setoff . . . ." (Maj. opn., *ante*, at p. 1142.) The Legislature has done no such thing. It is the intention of this court, opposed to that of the Legislature, that carries the day for the reinsurers.

It is elemental that in ascertaining the intent of the Legislature, " 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' " (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672], quoting *Stafford* v. *L.A. etc. Retirement Board* (1954) 42 Cal.2d 795, 799 [270 P.2d 12]; accord, *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) " 'Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible.' " (*Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455], quoting *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

Insurance Code sections 1031 and 1033,[1] which were simultaneously enacted in 1935, are both contained in division 1, part 2, article 14, of the Insurance Code, which relates to insolvency. For this reason, and because both statutes pertain to the rights of creditors of an insolvent insurance company, they clearly cannot be considered in isolation from one another. Nonetheless, accepting the insurance industry's bald claim that "the right of setoff is outside and antecedent to § 1033's distribution priorities," and that

---

[1] All statutory references are to the Insurance Code unless otherwise indicated.

therefore "there is no legal or public policy reason to attempt a reconciliation of § 1033 with § 1031,"[2] the majority examines section 1031 in a vacuum. By resolutely ignoring the context in which section 1031 appears, and by reading into that statute a purpose that does not appear from its words, the majority has profoundly distorted the legislative intendment.[3]

Section 1031, which does not specifically refer to reinsurers or any other particular class of creditors, is a general statute providing that "mutual debts or mutual credits" between an insolvent insurance company in liquidation and "any other person" may be set off and the balance only allowed, provided that "no set-off shall be allowed in favor of such other person where . . . [¶] (a) The obligation of the [insolvent insurer] to such other person does not entitle such other person claiming such set-off to share as a claimant in the assets of such person in liquidation."

Section 1033 is a much more specific statute that *does* refer to reinsurer claims. Subdivision (a) of section 1033, the pertinent portion of which is set forth in the margin below,[4] prescribes the order in which claims against an insolvent insurer are to be allowed. The statute divides claims into six classes, each entitled to priority over the class following it, in order. Creditors in a given class may be paid only after the assets of the insolvent insurer

---

[2] Brief of amici curiae American Council of Life Insurance, Reinsurance Association of America, American Insurance Association, the Alliance of American Insurers, and the National Association of Independent Insurers.

[3] The majority also misrepresents the trial court's ruling, stating that "The trial court granted the Commissioner's summary judgment motion on the ground that section 1031 allows a setoff only when the assets of the liquidating estate are sufficient to pay in full all the claims asserted by claimants in priority classes higher than the claimant asserting the setoff right." (Maj. opn., *ante*, at pp. 1125-1126.) Although this is the effect of the judgment of the trial court it was not the rationale. The trial judge summed up his reasoning as follows: "All counsel acknowledge that a setoff amounts to a legislative grant of an otherwise disfavored preference. As such a preference is inconsistent with the otherwise equal treatment of all others within any applicable priority, it therefore must be strictly construed. As sought to be applied here, it would also prefer a priority six creditor to all priority five claimants, a result irreconcilable with the purpose of Article 14 of the Insurance Code." As the trial court correctly noted, "The overriding purpose of Article 14 is to protect insureds first."

[4] Section 1033 employs the following language to determine the order in which claims against an insolvent insurer are to be allowed:

"(a) Claims allowed in a proceeding under this article shall be given preference in the following order:

"(1) Expense of administration.

"(2) Unpaid charges due under the provisions of Section 736 [i.e., the costs of the commissioner's examination of the books of the insolvent insurer].

"(3) Taxes due to the State of California.

"(4) Claims having preference by the laws of the United States and by the laws of this state.

"(5) All claims of the California Guarantee Association . . . , together with claims for refund of unearned premiums and all claims of policyholders of an insolvent insurer that are not covered claims.

have been distributed pro rata to all other classes of creditors with higher priority, and such creditors have been paid in full. The highest priority claims are those relating to the expense of administration. The second highest relate to the cost of the Commissioner's examination of the books and papers of the insolvent insurer. (§ 736.) The third and fourth priorities relate to unpaid taxes and other claims having preference under federal and other state statutes. The fifth priority—which has particular significance for this case—relates to the claims of the California Insurance Guarantee Association (CIGA) and similar associations, "together with claims for refund of unearned premiums and all claims of policyholders" that are not "covered claims" within the meaning of section 1063.1. The sixth and last priority under section 1033 includes "[a]ll other claims." Among the claims explicitly excluded from the fifth priority and therefore placed in the lowest priority are *"any obligations of the insolvent insurer arising out of any reinsurance contracts,"* because these are not "covered claims" within the meaning of paragraph (3) of subdivision (c) of section 1063.1.

Because the exclusion of reinsurer claims is so obviously inimical to its view of this case, the majority belittles it, stating that "the apparent exclusion of a reinsurer's claim from subdivision (a)(5) effects no substantive change." (Maj. opn., *ante*, at p. 1140.) Reinsurer claims were already within the residual sixth rank, the majority explains, because a reinsurer's claim "is not a claim of CIGA . . . or any otherwise uncovered claim asserted by a policyholder of the insolvent."[5] (*Ibid.*) This analysis completely misses the point, which is the explicit manner in which the Legislature expressed its specific intent to subordinate the rights of reinsurers to those of policyholders.

The setoff allowed by the majority under section 1031 frustrates this manifest legislative purpose because it provides reinsurers the very priority that the Legislature prevented. (See *Baker* v. *Gold Seal Liquors* (1974) 417 U.S. 467, 473 [41 L.Ed.2d 243, 249, 94 S.Ct. 2504]; *People* v. *California etc. Trust Co.* (1914) 168 Cal. 241, 248 [141 P. 1181].) There is no basis for this unduly expansive interpretation of section 1031. By permitting the use of

---

*Claims excluded by paragraph*[ ] *(3)* (except claims for refund of unearned premiums) . . . *of subdivision (c) of Section 1063.1* [i.e., claims "arising out of any reinsurance contract"] . . . *shall be excluded from this priority.*

"(6) All other claims." (Italics added.)

[5]The majority also says that the exclusion does not apply "[t]o the extent the reinsurer submits a claim for a refund of unearned premiums." (Maj. opn., *ante*, at p. 1140.) This statement is baffling. The reinsurer claims against a reinsured are for a percentage of the earned premium received by the reinsured, not a refund of unearned premiums. Such reinsurer claims arise entirely out of the reinsurance contract and are therefore clearly excluded from the fifth class.

setoff to diminish the amount of reinsurance payable to the liquidator, the majority has given a general statute, which does not mention reinsurer claims and was never intended to provide any particular benefit to reinsurers, precedence over a more detailed statute—section 1033—specifically designed to subordinate their interests, with respect to a matter within the purview of both statutes. This violates the fundamental principle that where there is a conflict the more specific statute controls over the more general. (2B Sutherland, Statutory Construction (5th ed. 1992) § 51.02, p. 121.) As this court recently reiterated, " 'A specific provision relating to a particular subject will govern a general provision, even though the general provision standing alone would be broad enough to include the subject to which the specific provision relates.' " (*Woods* v. *Young, supra,* 53 Cal.3d 315, 325, quoting *People* v. *Tanner* (1979) 24 Cal.3d 514, 521 '[156 Cal.Rptr. 450, 596 P.2d 328].) Indeed, the Legislature has itself declared that "when a general and. [a] particular provision are inconsistent, the latter is paramount to the former. So that a particular intent will control a general one that is inconsistent with it." (Code Civ. Proc., § 1859.)

The precedence the majority accords section 1031 also violates the rule that insolvency statutes should not be construed to create creditor preferences not expressly specified by the Legislature, as such preferences "are regarded with extreme disfavor." (3A Sutherland, Statutory Construction (4th ed. 1986) § 69.07, p. 469; 3 Collier on Bankruptcy (15th ed. 1992) § 507.02[2], p. 507-11 ["Priorities are to be fixed by Congress. Courts are not free to fashion their own rules . . . ."]; see also, discussion, *post,* at pp. 1167-1168.) If a setoff may be denied that merely provides a bankrupt's creditor a preference over another of equal rank (see, e.g., *Walker* v. *Wilkinson* (5th Cir. 1929) 296 Fed. 850, 853, cert. den. 265 U.S. 596 [68 L.Ed. 1198, 44 S.Ct. 639]), a setoff that gives an advantage to one creditor at the expense of a co-creditor of higher rank is more obviously improper. The order of priorities prescribed by section 1033 is one of the most important ways in which the Legislature achieves the chief purpose of the insolvency statutes: an equitable distribution of the assets of an insolvent insurance company. We should respect the legislative prescription. The majority's adoption of the view of the Court of Appeal that " 'entitlement' under section 1031(a) should be considered *independently* of [the insolvent insurer's] obligations to other claimants" (maj. opn., *ante,* at p. 1138, italics added) pursuant to section 1033 is no more than an ipse dixit, for which there is no support in the regulatory scheme, relevant case law, or reason.

Acknowledging "that the claims of policyholders are generally entitled to priority over the claims of reinsurers" (maj. opn., *ante,* at p. 1140), the majority contends that "[n]onetheless, the Legislature has created an exception to the general rules of priority in situations in which the claimant and

the insolvent have mutual debts; that exception is codified in section 1031." (*Ibid.*) The notion that section 1031 codifies an "exception" to the priorities specified in section 1033 even though it does not expressly purport to do so is untenable even apart from the fact that it gives a general statute precedence over a conflicting specific statute.

First of all, as a general rule of statutory construction, courts cannot create exceptions to rules of general application in the absence of an explicit legislative intention to do so. (*Stockton Theatres, Inc.* v. *Palermo* (1956) 47 Cal.2d 469, 476 [304 P.2d 7].) "A court may not insert into a statute qualifying provisions not intended by the Legislature and may not rewrite a statute to conform to an assumed legislative intent not apparent. (*Bruce* v. *Gregory* (1967) 65 Cal.2d 666, 674 [56 Cal.Rptr. 265, 423 P.2d 193] . . . .)" (*Burnsed* v. *State Bd. of Control* (1987) 189 Cal.App.3d 213, 217 [234 Cal.Rptr. 316]; 2A Sutherland, Statutory Construction (5th ed. 1992) § 47.11, p. 165.) The Legislature has provided no reason to believe it intended section 1031, which is merely permissive (see discussion, *post,* at pp. 1150-1151), to constitute an exception to section 1033, which is mandatory. The *opposite* conclusion is indeed far more justifiable, as a specific statute such as section 1033 may be "treated as an exception" to a general statute, like section 1031, with which it would otherwise be in conflict. (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505]; *English Manor Corp.* v. *Vallejo Sanitation & Flood Control Dist.* (1974) 42 Cal.App.3d 996, 1000-1001 [117 Cal.Rptr. 315].

Furthermore, the provision of section 1033 giving the claims of policyholders and certain other creditors priority over the claims of reinsurers (§ 1033, subd. (a)(5)) was added to that statute in 1979 (Stats. 1979, ch. 384, § 1, p. 1445), *45 years after enactment of section 1031.* The precedence given to section 1031 thus also violates the rule that if new provisions cannot be reconciled with earlier provisions of an entire scheme, the new provisions should prevail. "[W]here two statutes deal with the same subject matter, the more recent enactment prevails as the latest expression of the legislative will." (2B Sutherland, Statutory Construction (5th ed. 1992) § 51.02, p. 122, fn. omitted); *Stafford* v. *L.A. etc. Retirement Board, supra,* 42 Cal.2d 795, 798; *Woodard* v. *Southern Cal. Permanente Medical Group* (1985) 171 Cal.App.3d 656, 664 [217 Cal.Rptr. 514].) The majority's conclusion that the general provisions of section 1031 constitute an "exception" to the specific grant of policyholder priority over reinsurers enacted nearly a half century later not only ignores the rules ordinarily employed by appellate courts to determine legislative purpose, but ascribes to the Legislature an intention it clearly repudiated when it last addressed the issue.

Equally untenable is the majority's alternative view that the reinsurers have a "contractual entitlement" that supersedes section 1033 because "the

contract between [the reinsurer and the insolvent insurer] does not make setoff contingent on the ultimate financial ability of the original insurer or its estate to first pay all claimants in higher priority classes." (Maj. opn., *ante*, at p. 1125.) Clearly, two parties cannot by contract deprive a third party of statutory rights. This court has pointed out on more than one occasion that "the substantive law of this state cannot be enlarged, circumvented, defeated, or modified by any provision which the insurer may have elected to place in its contract in derogation of or in conflict therewith." (*Malmgren* v. *Southwestern A. Ins. Co.* (1927) 201 Cal. 29, 33 [255 P. 512]; *Wildman* v. *Government Employees' Ins. Co.* (1957) 48 Cal.2d 31, 39 [307 P.2d 359].)

The inordinately broad and dispositive effect the majority opinion accords section 1031 reflects not only its indifference to related statutes that specifically address and subordinate the rights of reinsurers, but the majority's basic misunderstanding of the concept of setoff generally.

## II.

Section 1031 derives not simply "from the equitable right of setoff established in 17th century England" (maj. opn., *ante*, at p. 1124), but more venerably from the concept of compensation, or *compensatio*, known to preclassic Roman procedural law. (See, generally, Comment, *Automatic Extinction of Cross-Demands: Compensatio From Rome to California* (1965) 53 Cal.L.Rev. 224; Loyd, *The Development of Set-off* (1916) 64 U.Pa.L.Rev. 541.) From the beginning, compensation and setoff have been permitted only when, due to the particular circumstances of the case, it is fair to do so. Compensation is never permitted under the civil law "where its operation would involve a deception and a disappointment of the just expectation and confidence of the party against whom it is set up." (3 Story, Commentaries on Equity Jurisprudence (14th ed. 1918) § 1877, p. 479.) Similarly, "a set-off is ordinarily allowed in equity only when the party, seeking the benefit of it, can show some equitable ground for being protected against his adversary's demand; the mere existence of cross demands is not sufficient." (*Id.*, § 1872, p. 474.) As the United States Supreme Court has explained, courts do not allow setoff "except under very special circumstances, and where the proofs are clear *and the equity is very strong*. (*Scammon* v. *Kimball* (1875) 92 U.S. 362, 367 (2 Otto) [23 L.Ed. 483, 485], italics added; accord, *Federal Deposit Ins. Corp.* v. *Bank of America* (9th Cir. 1983) 701 F.2d 831, 836-837, cert. den. 464 U.S. 935 [78 L.Ed.2d 310, 104 S.Ct. 343] ["Setoff will not be permitted when it would be inequitable or contrary to public policy to do so"].)

Judicial discretion to deny setoff that would have unfair consequences exists *even if*, like section 1031, the applicable statute provides that setoff

"shall" be allowed. Although the statutory language appears to be mandatory, "it has been held that the right of set-off is permissive, not mandatory, and that its application lies within the discretion of the trial court, which exercises such discretion under the general principles of equity. [Citation.]" (*O'Connor* v. *Insurance Co. of North America* (N.D.Ill. 1985) 622 F.Supp. 611, 616; accord, *Matter of Bevill, Bresler & Schulman Asset Mgmt.* (3d Cir. 1990) 896 F.2d 54, 57; *Melamed* v. *Lake County Nat. Bank* (6th Cir. 1984) 727 F.2d 1399, 1404; *Cumberland Glass Co.* v. *De Witt* (1915) 237 U.S. 447, 455 [59 L.Ed. 1042, 1045-1046, 35 S.Ct. 636].)

Thus, in California cases in which the right to setoff has been at issue, the court was governed, " '*not by the statute of setoff, but by the general principles of equity.*' " (*Pendleton* v. *Hellman Com. etc. Bank* (1922) 58 Cal.App. 448, 451 [208 P. 702], quoting *Nashville Trust Co.* v. *Fourth Nat. Bank* (1892) 91 Tenn. 336, 344 [18 S.W. 822, 824] italics added.) In other words, "[t]here is no magic in the statutory enactment of a rule derived from equity, whereby in receiving this legislative sanction the principle is deprived of its equitable qualities." (58 Cal.App. at p. 451; see also *Gonsalves* v. *Bank of America* (1940) 16 Cal.2d 169 [105 P.2d 118].)

The two most recent opinions of this court involving setoff—*Jess* v. *Herrmann* (1979) 26 Cal.3d 131 [161 Cal.Rptr. 87, 604 P.2d 208] and *Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352 [113 Cal.Rptr. 449, 521 P.2d 441, 65 A.L.R.3d 1266]—illustrate the foregoing principles at work and show that the taking into account of equitable factors and policy considerations does not amount to " 'economic regulation under the guise of judicial decision-making,' " as the majority fallaciously claims. (Maj. opn., *ante*, at p. 1142.)

*Jess* v. *Herrmann, supra*, involved cross-actions for personal injuries arising out of a collision between the parties' vehicles, in which both plaintiff and defendant were injured. After deductions for comparative negligence, the plaintiff (Jess) was awarded $60,000 in damages and an award of $5,600 was made to the defendant (Herrmann). The trial court invoked a mandatory setoff rule (Code Civ. Proc., §§ 431.70, 666) and, over the objection of both parties, offset the two awards and rendered judgment for plaintiff only in the amount of $54,400. Concluding that the trial court erred in setting off the parties' respective judgments, this court vacated the judgment and remanded. In doing so the court observed that "both the public policy of California's financial responsibility law and considerations of fairness clearly support a rule barring a setoff of one party's recovery against the other. . . . [E]quitable considerations would best be served by remanding the matter to the trial court so that it may ascertain the parties' actual

insurance coverage and thereafter resolve the setoff issue with full knowledge of such coverage." (*Jess* v. *Herrmann, supra,* 26 Cal.3d at p. 142, fn. omitted.)

The unfairness that concerned the court was that, assuming both parties were adequately insured, Jess's recovery from Herrmann's insurer would be limited to $54,400 but Herrmann would be denied any recovery whatsoever from Jess's insurer. In that common situation setoff "diminishes *both* injured parties' actual recovery and accords both insurance companies a corresponding fortuitous windfall at their insureds' expense. Indeed, in this context, application of a mandatory setoff rule produces the anomalous situation in which a liability insurer's responsibility under its policy depends as much on the extent of the injury suffered by its own insured as on the amount of damages sustained by the person its insured has negligently injured." (*Jess* v. *Herrmann, supra,* 26 Cal.3d at p. 138, italics in original.) As will be seen, setoff has equally anomalous results in the present case.

*Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d 352, also shows that setoff will not be allowed where it would result in an inequity or frustrate strong public policy. The plaintiff in *Kruger* sued the defendant bank on the theory that it had improperly exercised its right of setoff, for a credit card delinquency, against plaintiff's checking account which comprised only statutorily exempt unemployment and state disability benefits. This court reversed, denying setoff. Despite the statute granting bankers a lien on customer deposits "for the balance due to the banker . . . from the customer in the course of the business" (Civ. Code, § 3054), the court emphasized that "the creditor's right to setoff is not absolute," but may be restricted by judicial limitations necessary to uphold a state policy. (11 Cal.3d at p. 367.) The opinion reasons that "to permit bankers' setoffs against unemployment and disability benefits will frustrate the Legislature's objectives in providing such benefits and in protecting them from seizure by creditors." (*Ibid.*) *Kruger* emphasizes the numerous occasions on which California courts have limited the right of setoff in order to effectuate state policies.[6] The setoff allowed by the majority in the present case is no less inimical to the important state policy of protecting insureds, as will be described.

This court's opinion in *Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d 352, was relied upon by the Ninth Circuit in *Federal Deposit Ins. Corp.* v. *Bank of*

---

[6]The court cited the following cases: *McKean* v. *German-American Savings Bank* (1897) 118 Cal. 334 [50 P. 656]; *Roberts* v. *Spires* (1925) 195 Cal.267 [232 P. 708, 37 A.L.R. 763]; *Keck* v. *Keck* (1933) 219 Cal. 316 [90 Cal.Rptr. 600, 475 P.2d 872]; *Crooks* v. *State Bar* (1970) 3 Cal.3d 346 [90 Cal.Rptr. 600, 475 P.2d 872]; *Avila* v. *Leonardo* (1942) 53 Cal.App.2d 602 [128 P.2d 43]; *Williams* v. *Williams* (1970) 8 Cal.App.3d 636 [87 Cal.Rptr. 754]; *Berryessa Cattle Co.* v. *Sunset Pacific Oil Co.* (9th Cir. 1937) 87 F.2d 972; and *Linder* v. *McBride* (1920) 7 I.A.C. 144. (*Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d at p. 368, fn. 24.)

*America, supra,* 701 F.2d 831 (hereafter *Federal Deposit*), where setoff was denied in circumstances analogous to those of the present case. There, a Puerto Rican bank (Banco Credito) issued a subordinated capital note in the amount of $5 million to the Bank of America. The note purchase agreement, approved by the Puerto Rican Secretary of the Treasury, explicitly acknowledged the Bank of America's right of setoff in the event Banco Credito became insolvent. About four years later, when Banco Credito became insolvent, the Federal Deposit Insurance Corporation (FDIC) became receiver for the purpose of total liquidation. Among Banco Credito's assets were about $1 million in deposits with the Bank of America. The Bank of America thereafter set off this amount as a credit against Banco Credito's remaining debt on the note. FDIC sued, alleging breach of contract and conversion, and the Bank of America defended on the ground that it had properly set off the deposit balances against the obligation of Banco Credito under the subordinated note. (*Id.,* at p. 834.) The district court allowed the setoff, granting summary judgment for the Bank of America. The Ninth Circuit reversed.

Preliminarily, the circuit court of appeals observed that the subordination of the note was required by Puerto Rican law "for the protection of the depositors and creditors of Banco Credito" (*Federal Deposit, supra,* 701 F.2d at p. 835) as well as the general public; when the Secretary of the Treasury suspended the insolvent bank's obligation to pay the note "his purpose was to prevent, for the benefit of creditors, any further diminution of the assets of Banco Credito, thereby protecting its depositors and creditors. Thus, at that point, Bank of America was relegated to a position behind the depositors and general creditors of Banco Credito—an eventuality obviously contemplated as possible when Bank of America bought the subordinated note." (*Id.,* at p. 836.) The court noted that "[t]he effect of the offset was to defeat the purpose of the subordination of the capital note, to the tune of approximately one million dollars. Not only that, but the effect was also to put the Bank of America ahead of all of the depositors and creditors of Banco Credito, by that amount, rather than its being subordinate to their rights. Bank of America kept the million; the depositors and creditors got none of it." (*Ibid.*)

Denying setoff, the Ninth Circuit pointed to this court's emphasis on the equitable nature of setoff. "As Justice Tobriner, speaking for a unanimous California Supreme Court, remarked, 'The creditor's right to setoff is not absolute, but may be restricted by judicial limitations imposed to uphold a state policy of protecting the rights of the debtor.' [Citing *Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d at p. 367.] Setoff will not be permitted when it would be inequitable or contrary to public policy to do so." (*Federal Deposit, supra,* 701 F.2d at pp. 836-837.)

"The purpose for which Banco Credito sought the loan from Bank of America," the Ninth Circuit recognized, "was to strengthen its capital position, and Bank of America knew it." (*Federal Deposit, supra,* 701 F.2d at p. 837.) "To permit Bank of America to offset Banco Credito's deposits against its liability on the subordinated note deprives the intended beneficiaries of the subordinated loan, Banco Credito's depositors and creditors, pro tanto, of the very protection that the law, and the subordination provisions of the agreement, were designed to create." (*Ibid.*) Precisely the same rationale warrants denial of setoff in the instant case. Section 1033 provides protections comparable to those of the Puerto Rican law that required subordination of the note. Further, as later explained (see discussion, *post,* at p. 1160), reinsurance has the effect of increasing the surplus of the primary insurer and thereby represents to policyholders and others that said insurer is able to meet its financial obligations. Reinsurers are very much aware of this, as they are aware that California law relegates them to the lowest creditor priority. The allowance of reinsurer setoff permits betrayal of the representation to policyholders and grants reinsurers a windfall they had no reasonable right to expect.

The majority's attempt to distinguish *Federal Deposit, supra,* on the ground that it contains no "reference to the statutory right of setoff" and because stock subscription debts are not allowed in California (maj. opn., *ante,* at p. 1141) fails dismally. The application of a statute is inconsequential; as already explained, statutes authorizing or even mandating setoff have never been permitted to enlarge the right to setoff beyond that permitted by the applicable equitable principles. Such statutes do not "enable a party to make a set-off in cases where the principles of legal or equitable set-off did not previously authorize it." (*Sawyer* v. *Hoag* (1873) 84 U.S. 610, 622 [21 L.Ed. 731, 736].) The propriety of stock subscription debts is analytically irrelevant to the opinion in *Federal Deposit* and its precedential value to this case.

### III.

The majority offers two reasons the allowance of setoff in this case does not offend public policy: (1) under the insurance insolvency statutes "original insureds have no interest or right in a contract of reinsurance (§ 623), and no rights against the reinsurer (§ 922.2) [maj. opn., *ante,* at p. 1142];" and (2) the interests of policyholders and the general public are advanced by spreading the risk through reinsurance, and this will not effectively occur if the offsetting of debts is disallowed. The Court of Appeal offered the additional reason that the losses of primary policyholders will be covered by CIGA, which is financed by the insurance industry.

These contentions do not bear scrutiny. Properly understood, the considerations identified by the majority and the Court of Appeal (and other relevant considerations) compel the denial, not the allowance, of setoff.

A.

The majority's reliance on provisions of the insolvency statutes declaring that original insureds have no interest in a contract of reinsurance (§ 623) and cannot proceed directly against the reinsurer (§ 922.2) is ironic, because these statutes were intended to protect policyholders and other creditors of an insolvent insurer against reinsurers.

The reason third parties ordinarily have no rights in reinsurance agreements, which ostensibly are contracts for indemnity rather than liability, flows not simply from their lack of privity (see, generally, Annot. (1936) 103 A.L.R. 1485),[7] but from the need to preserve the benefits of such agreements to *all* policyholders and creditors, not particular claimants or creditors. (Nutter, *Insurer Insolvencies, Guaranty Funds, and Reinsurance Proceeds*, 1979 Fed'n. of Ins. Couns. Q. 373, 374.)[8] The statement at the end of section 922.2 which the majority emphasizes—that "[t]he original insured or policyholder shall not have any rights against the reinsurer which are not specifically set forth in the contract of reinsurance"—was never intended to facilitate a preference to reinsurers vis-á-vis policyholders or any other creditors with respect to the assets of an insolvent reinsured; it simply ensures that, absent a cut-through endorsement in the reinsurance agreement (see fn. 8, *ante*), all policyholders have the same rights and that their rights and those of other creditors as against the assets of the insolvent insurer cannot be abrogated by the reinsurance agreement.

Moreover, as the Supreme Court of Colorado has recognized, "because the public interest is implicated in reinsurance contracts . . . such contracts may not be considered pure indemnity contracts . . . ." (*Bluewater Ins. Ltd.* v. *Balzano* (Colo. 1992) 823 P.2d 1365, 1368.) Due to this public interest, and because policyholders and other third parties have no direct right of action against reinsurers, this court should enhance the power of the Commissioner of Insurance, as liquidator, to protect the public against overreaching reinsurers by enforcing section 922.2. As pointed out in *Corcoran* v. *Ardra Ins.*

---

[7]The rule, which has its source in French law, was first established in this country in *Mutual Safety Ins. Co.* v. *Hone* (1849) 2 N.Y. 235. See also the numerous cases cited in *Fontenot* v. *Marquette Casualty Co.* (1971) 258 La. 671, 690 [247 So.2d 572, 578-579].)

[8]"The only recognized exception to the principle that reinsurance is a general asset for the benefit of all policyholders is when the reinsurance agreement specifically indicates an intent on the part of the reinsurer to become directly liable to an original insured. This assumption of direct liability is technically a novation, but is commonly called a 'cut-through endorsement.' " (1979 Fed'n. of Ins. Couns. Q. at pp. 374-375.)

*Co., Ltd.* (2d Cir. 1988) 842 F.2d 31, a liquidator's power to collect on reinsurer agreements "is a matter of no little concern, for policy holders have no direct right of action against reinsurers; only the Superintendent, as liquidator, can recover from the reinsurer. [Citations.] The extent to which the Superintendent is able to collect thus affects the degree to which the insolvent insurer's estate will have assets sufficient to satisfy the claims of its creditors." (*Id.*, at p. 37.)

The court in *Corcoran* v. *Ardra Ins. Co., Ltd., supra,* 842 F.2d 31, is not alone in comprehending that the equitable considerations favoring policyholders and injured claimants over reinsurers are unaffected by the fact that they are not parties to the reinsurance agreement and cannot proceed directly against reinsurers. For example, in *Glacier Gen. Assur. Co.* v. *Cas. Indem. Exchange* (D.Mont. 1977) 435 F.Supp. 855, it was held that the equitable remedy of rescission will not be allowed where the effect would be to discharge reinsurance obligations, because the burden would fall unfairly "on the policyholders or claimants, or some state-created fund." (*Id.*, at p. 861.) The court was properly unimpressed by the fact that policyholders and claimants were not parties to the contract and had no direct rights against the reinsurer, because, in light of the equitable character of the issue before it, the court "cannot blind itself to the fact that third parties are involved." (*Id.*, at p. 862.) Similarly, in *O'Connor* v. *Insurance Co. of North America, supra,* 622 F.Supp. 611, which the majority relies upon in a different connection (see *post*, at pp. 1166-1169), the court recognized the need to "consider the concerns of persons who are not necessarily parties to a contract, but who nonetheless also have claims against assets of the insolvent's estate." (622 F.Supp. at p. 615, fn. 2.) Here too, the fact that policyholders have no direct rights under the reinsurance agreement does not relieve this court of the duty to protect them, a duty imposed not only by the equities but by several specific provisions of the Insurance Code.

Section 922.2, which prevents policyholders from proceeding directly against reinsurers, was enacted in response to the opinion of the United States Supreme Court in *Fidelity & Deposit Co.* v. *Pink* (1937) 302 U.S. 224 [82 L.Ed. 213, 58 S.Ct. 162]. In that case the reinsurer refused to pay the liquidator of an insolvent insurance company on the basis of a clause in the reinsurance agreement providing that the reinsurer's liability would arise only upon actual payment by the insurer—an impossibility given the insurer's insolvency. By upholding the contractual provision, the Supreme Court permitted reinsurers to avoid complete payment to an insolvent reinsured. To reverse this result, New York enacted legislation in 1939 designed to require, among other things, that in the event of the insolvency of the ceding company, reinsurance proceeds were to be paid directly to the liquidator

upon liability of, not actual payment by, the insolvent insurer. (1939 N.Y. Laws, ch. 882, § 77.) Such an "insolvency clause" in the reinsurance agreement is now almost universally mandated by similar state statutes, of which section 922.2 is an example.

Though section 922.2 was chiefly designed to address a problem different from that presented in this case,[9] the statute is based on the idea that the reinsurer's liability ought to be determined by the occurrence of the event insured against by the reinsured, not by the solvency of the reinsured. "[S]ince the reinsurer has received a premium designed to compensate it for assuming the risks incident to a contract of indemnity against liability, there seems to be no reason for allowing the reinsurer to gain because of the reinsured's insolvency." (Note, *Distribution of the Proceeds of a Reinsurance Policy Upon the Insolvency of the Reinsured* (1936) 50 Harv.L.Rev. 93, 98-99.) Unlike policyholders, who paid money to avoid risk, reinsurers were paid to accept it; they should not be permitted to walk away fully compensated, leaving policyholders, injured claimants and other more favored creditors holding the bag. The reinsurer setoff allowed by the majority in this case as a result of the insolvency of the reinsured will deprive policyholders and other preferred creditors of about $300 million.[10] The majority's mysterious conclusion that "no 'diminution because of insolvency' will occur in light of this setoff" (maj. opn., *ante*, at p. 1135) is judicial self-deception.

By ignoring the general purpose of the statute—which was to prevent reinsurers from turning insolvency to their own advantage—and by misconceiving the reason for the language preventing a particular policyholder from proceeding directly against a reinsurer—which was to protect the rights of all other policyholders and creditors—the majority opinion has given section 922.2 precisely the opposite effect it was intended to have.

The interests of policyholders in an insolvent insurer's contract of reinsurance are protected under section 1037, which requires the Commissioner of Insurance, as liquidator, to marshall the assets of the insolvent company for the benefit of *all* creditors, and section 1033, which, as we have seen, provides policyholders and certain other creditors priority over reinsurers in

---

[9]A derivative purpose of the insolvency clause, which does address a problem presented by this case, is discussed, *post*, at page 1160.

[10]It may also result in the denial of tax and other claims of the State of California and the federal government, if any, which are in the third and fourth priorities specified by section 1033. With respect to any federal claims that may be frustrated, the setoff allowed by the majority conflicts not only with section 1033, but apparently as well with the so-called "superpriority statute," 31 United States Code section 3713(a)(1), which provides that "A claim of the United States Government shall be paid first when—[¶](A) a person indebted to the Government is insolvent and—. . . [¶] (iii) an act of bankruptcy is committed[.]"

the allowance of claims. As this court has pointed out, setoff cannot be allowed where it would "disturb the just and equal distribution of the assets" of an unsettled estate. (*People* v. *California etc. Trust Co., supra,* 168 Cal. 241, 248.) A setoff having that effect is inequitable and improper because it "would not only prevent a *pro rata* distribution among [the estate's] creditors, but, on the contrary, would give the creditor claiming the benefit of setoff an undue preference over other creditors of the estate to the extent of full payment of his claim. [Citation.]" (*Ibid.*; accord *Sawyer* v. *Hoag, supra,* 84 U.S. 610, 622 [21 L.Ed. 731, 736].)

Reinsurers are highly sophisticated entities whose complex commercial arrangements are largely unregulated by government.[11] Policyholders, on the other hand, are often unsophisticated individuals without the expertise to independently assess the financial strength of a primary insurer or otherwise protect themselves against insurer insolvency. Such persons may be devastated by the unexpected absence of adequate protection against catastrophic loss.[12]

## B.

The majority's policy justification for setoff is that it will facilitate risk-spreading and permit smaller insurers to remain in business. The majority reasons that reinsurer setoff "not only spreads risk but also acts as mutual

---

[11]A congressional committee has described reinsurance as "the 'black hole' of solvency regulation." (Failed Promises: Insurance Company Insolvencies, Rep. by the Subcom. on Oversight & Investigations of the House Com. on Energy & Commerce, H.R. Rep., Committee Print 101-P (101st Cong., 2d Sess.) p. 60 (1990) [hereinafter Failed Promises].) As the supreme courts of many states have noted, the relatively unregulated nature of the reinsurance business is one of the reasons the reinsurance obligations of an insolvent insurer are almost universally assigned a lower priority than an insolvent's obligations to policyholders under primary policies. For example, in *Neff* v. *Cherokee Ins. Co.* (Tenn. 1986) 704 S.W.2d 1, the Tennessee Supreme Court observed that "contracts of reinsurance are not subjected to the strictures and requirements of most of the insurance statutes [,] . . . although the statutes do place certain financial obligations on companies that seek credit under reinsurance agreements for losses or unearned premiums on their liability. . . . [I]f reinsurers want the protections and advantages of the statute, they must also assume the liabilities and obligations of these provisions, including the attendant tax burden. To do otherwise would place reinsurance in a wholly preferred position to direct policies, which would be clearly contrary to the statutory scheme . . . ." (*Id.,* at p. 6; accord *In re Liquidations of Reserve Ins. Co.* (1988) 122 Ill.2d 555 [524 N.E. 2d 538]; *State* ex rel. *Long* v. *Beacon Ins. Co.* (1987) 87 N.C.App. 72 [359 S.E.2d 508]; *Foremost Life Ins. Co.* v. *Department of Ins.* (1980) 274 Ind. 181 [409 N.E.2d 1092]; *Aetna Casualty & S. Co.* v. *International Re-Ins. Corp.* (1934) 117 N.J. Eq. 190 [175 A. 114].)

[12]Because it is limited to debts arising under "cross-reinsurance" contracts, this case does not address other types of reinsurer setoff presenting different equitable considerations, such as, for example, whether a reinsurer should be allowed to offset the unpaid premium on a policy against its obligation to pay a loss on that policy.

security for performance." (Maj. opn., *ante*, at p. 1142.) This reasoning, which is at the heart of the majority opinion, is specious. There is no empirical evidence whatsoever that the ability of reinsurance pools to spread risk requires the setoff the majority allows. Moreover, the spreading effect the majority celebrates only occurs in the context of insolvency if the liquidator pays valid claims against the insurer, which the majority prevents.

With respect to the need for mutual security, the majority, quoting Judge Easterbrook of the Seventh Circuit, says that " 'if the large firms [participating in reinsurance pools] could not count on the netting of balances [through setoff] to satisfy obligations, they would be more likely to exclude smaller or tottering firms—making new entry harder and precipitating failures of firms in difficulty.' " (Maj. opn., *ante*, at p. 1142, quoting *Stamp* v. *Insurance Company of North America* (7th Cir. 1990) 908 F.2d 1375, 1380.) This view—which, apparently because they share it, the majority does not condemn as " 'economic regulation under the guise of judicial decisionmaking' " (maj. opn., *ante*, at p. 1142)—places the perceived interest of the insurance industry above that of the public. There is no public interest in artificially propping up "tottering" insurance companies. Diminution in the volume of policies issued by "firms in difficulty" due to the unavailability of reinsurance is vastly preferable to the insolvency that results when the easy availability of reinsurance permits a financially insecure primary insurer to remain in business or to bite off more than it can chew (which is apparently what happened in this case).[13] In the former situation it is primarily the company that suffers; the victims of insolvency, on the other hand, invariably include thousands upon thousands of innocent policyholders and injured claimants.

It is probably true that the disallowance of reinsurer setoff would increase the cost of reinsurance and that this increase would be passed on to the insurance-buying public. Diffusion of the increased cost among millions of consumers is, however, much more bearable and equitable than visiting the equivalent cost upon the much smaller group of policyholders and others with claims against insolvent insurers.

The misguided public policy theory posited by the majority, which is inconsistent with the legislative assignment of the lowest priority to the

---

[13]A congressional inquiry into the insolvency of the Mission Insurance Company concluded that the chief reason "a company with less than $240 million in capital surplus [could] write enough bad business to cause a $1.6 billion failure" was its "excessive use of reinsurance." (Failed Promises, *supra*, at p. 12.) The committee report states that at one point more than 600 reinsurers were involved in reinsuring Mission's direct business. Very few were admitted to do business in California and 75 percent were foreign companies, based in Europe, the Middle East, Africa, Australia, India and elsewhere. (*Id.*, at pp. 12-13.) It was claimed "that the unlicensed reinsurers conspired to use Mission as a front to gain access to lucrative premiums in the United States marketplace." (*Id.*, at p. 14.)

claims of reinsurers, also reflects an incomplete appreciation of the function of reinsurance. In addition to spreading the risk, reinsurance significantly expands the underwriting capacity of the reinsured. Insurance companies are required by law to maintain a certain level of surplus, roughly the amount by which their assets exceed their liabilities. (§§ 700.02, 700.025.)[14] The surplus requirement imposes a limit on the amount of new business an insurer can write, as each new policy adds liabilities to its balance sheet and thereby decreases the insurer's surplus. "Reinsurance decreases liabilities on the reinsured's balance sheet, thus raising surplus and allowing a greater volume of new policies to be written." (1 Cal. Insurance Law & Practice (1992) § 11.01[4][e], p. 11-15.) Because the financial stability of a primary insurer is chiefly measured by its surplus, reinsurance enhances the stability of such an insurer in the eyes of both regulators and the public. (*Id.*, § 11.01[4][d], p. 11-14.) Reinsurance therefore not only permits but induces expansion of the underwriting business of both the reinsured and the reinsurer.

The deductions from liabilities that have this salutary economic effect on the reinsurance business are authorized by sections 922.1 and 922.15. The deductions are not, however, automatically available. Their use is explicitly conditioned on the protection of policyholders by inclusion of the insolvency clause in the reinsurance agreement. (§ 922.2.) Thus, the insolvency clause should be construed "not only to thwart the kind of windfall sanctioned by [*Fidelity & Deposit Co.* v.] *Pink*, [*supra*, 302 U.S. 224] [see discussion, *ante*, at pp. 1156-1157], but also to foil the associated evil of the abuse of the statutorily granted credit for reserves which looms in cases of insolvency. [¶] . . . The credit . . . is granted only because the reinsurance makes up the difference, maintaining the reserve at a prescribed minimum. If offsets were permitted . . . the quid pro quo would be destroyed." (*Bluewater Ins. Ltd.* v. *Balzano, supra*, 823 P.2d at p. 1371.)[15]

Allowing reinsurer setoff permits a reinsurer to reap the considerable benefit of section 922.2 without the attendant burdens consumers and other creditors assumed it would bear. The reinsurer is or should be aware that

[14]Pursuant to section 700.02, "surplus means the excess of admitted assets over the sum of (1) liabilities for losses reported, expenses, taxes and all other indebtedness and reinsurance of outstanding risks as provided by law, and (2) paid-in capital, in the case of an insurer issuing or having outstanding shares of capital stock, or (3) the minimum paid-in capital required, in the case of any other insurer."

[15]The Commissioner of Insurance's interpretation of the insolvency clause in this manner cannot easily be dismissed. Noting that there is "a degree of ambiguity in the insolvency clause," the court in *Bluewater Ins. Ltd.* v. *Balzano, supra*, deferred to the judgment of the Colorado Insurance Commissioner that the clause barred reinsurer setoff in circumstances similar to those presented here, because such a "construction of the insolvency clause is consistent with what is reasonably allowed or required by other provisions of the reinsurance statute and, for that reason, merits deference." (823 P.2d at p. 1373.)

policyholders and other creditors reasonably rely on reinsurance in evaluating the ability of the primary insurer to meet its obligations and justifiably assume it will protect them if for any reason the primary insurer is unable to do so. As earlier explained, setoff should not be permitted "where its operation would involve a deception and a disappointment of the just expectation and confidence of the party against whom it is set up." (3 Story, Equity Jurisprudence, *supra*, § 1877, p. 479.) Setoff is not only unfair, but contrary to the declared policy that reinsurance shall "provide adequate safeguards for the policyholders, creditors and the public." (§ 985, subd. (e).) As noted, by providing financial security to reinsurers beyond that allowed by the Legislature, setoff will encourage the reinsurance of marginal insurers, which should be discouraged. The availability of setoff may also cause reinsurers who believe a reinsured is in financial trouble to delay loss payments so that in the event of insolvency it will be in a stronger position than other creditors, a practice that might force the insolvency of primary insurers dependent upon reinsurance payables.

The unusual relationship that often exists between primary insurers and their reinsurers may also invite exploitation of the availability of setoff, to the disadvantage of the public. "While professional reinsurers may be independent companies, they frequently are subsidiaries or affiliates of primary insurance companies within a holding company family." (1 Cal. Insurance Law & Practice, *supra*, § 11.01[3][b], p. 11-9.) As earlier pointed out, "[m]ost large primary insurers maintain their own divisions to handle their reinsurance needs exclusively." (*Id.*, § 11.01[3][c], p. 11-10.) The "treaties" in the present case provide an excellent illustration of the unusually close business relationship that typically exists. Not only is Gibraltar, one of the two reinsurers under the "Relation A" contracts, the subsidiary of the other reinsurer, Prudential Reinsurance, but these two reinsurers are themselves reinsured under the "Relation B" contracts by Mission Insurance Company and its affiliate, Mission National Insurance Company, the primary insurers. Thus the affiliated Mission companies provide both primary policies of insurance to the public and reinsurance contracts to other insurers or reinsurers.

Allowing the setoff of debts incurred under the "Relation B" contracts to which Mission companies were parties subsidizes largely unregulated commercial transactions between parties whose common interests are in some measure inimical to those of policyholders. Allowing such setoff will not only encourage self-serving arrangements harmful to consumers, but disserve the overall long-term interests of the insurance industry. As one thoughtful commentator has written, the availability of setoff "diminishes the reinsurer's incentive to continually scrutinize and assess the financial

integrity of its reinsurance partners. This lack of scrutiny on an ongoing basis reduces the degree of self-regulation in the industry and tends to mask the existence of financially weak capacity in the marketplace. [¶] This lack of scrutiny is compounded if [as in the present case] a reinsurer is permitted offset rights not only among all its reinsurance contracts but also among contracts in which the reinsurer also may have ceded business to the insolvent insurer." (Jernigan, *The Case for Restricting Offsets* (July 1990) 91 Best's Rev. 55 at p. 124 (Prop./Cas. ed.).) The allowance of offset is particularly unwise in light of the extraordinary and very ominous growth in insurance insolvencies now taking place in this nation.[16] A congressional study of insurance insolvencies states that "[r]einsurance abuse has been a key factor in every insolvency studied by the Subcommittee" and that "[c]onflicts of interest in arranging reinsurance have been fairly common . . . ." (Failed Promises, *supra*, at p. 69.)

The inevitable response of reinsurance companies to the holding of the majority will be to enter into reciprocal insurance agreements or to issue policies of insurance only when they have potentially offsetting policies of reinsurance from the original insurers with which they do business. In this manner they will be able to largely insulate themselves from the risk of loss due to insolvency, shifting it instead to the unfortunate individuals who purchased policies from the insolvent insurer, as well as injured claimants, other creditors and the insurance-buying public.

Reinsurance companies do not need this protection. Because of their expertise and superior access to information,[17] reinsurers are already in a much better position than policyholders and others to assess the strengths and weaknesses of the primary insurer and protect themselves accordingly. For example, they can decline to reinsure financially unstable insurers or increase the cost of reinsurance commensurate with increased risk.

---

[16]A 1989 study by the National Association of Independent Insurers states that "over 150 property/casualty insurance companies have become insolvent since 1969, with nearly half of them occurring during the past 5 years. The number of companies designated for regulatory attention by the National Association of Insurance Commissioners because of financial problems has more than quadrupled in the past 10 years, and the cost of insurance insolvencies is growing at an alarming rate." (Failed Promises, *supra*, at p. 2.)

[17]Section 622 provides that "Where an insurer obtains reinsurance, he must communicate all the representations of the original insured, *and also all the knowledge and information he possesses, whether previously or subsequently acquired, which are material to the risk.*" (Italics added.) See also, Staring, *The Law of Reinsurance Contracts in California in Relation to Anglo-American Common Law* (1988) 23 U.S.F.L.Rev. 1, 5-8; *Firemen's F. I. Co.* v. *Aachen & Munich F. I. Co.* (1906) 2 Cal.App. 690 [84 P.2d 53]; and *Glacier Gen. Assur. Co.* v. *Cas. Indem. Exchange, supra,* 435 F.Supp. 855, 857.

## C.

Acknowledging the reality the majority avoids, the Court of Appeal in effect conceded reinsurer setoff would diminish assets available to cover the losses of primary policyholders. The Court of Appeal nevertheless rejected the Commissioner's public policy argument that setoff should for this reason be disallowed because it believed such policyholder losses would for the most part be covered by CIGA[18] and that "[t]his expense will be shared among all the insurers doing business in this state . . . ." The implication that policyholders will be made whole at the expense of the insurance industry, and that the public will not pay, is simply not true.

First of all, CIGA's expenses will not be borne by the insurance industry. The Insurance Code specifically provides that CIGA's "plan of operation" (see § 1063) "shall contain provisions whereby each member insurer is *required* to recoup over a reasonable length of time a sum reasonably calculated to recoup the assessments paid by the member insurer under this article *by way of surcharge on premiums charged for insurance policies* to which this article applies." (§ 1063.14, subd. (a), italics added; see also § 1063.145.) Because, as the Chief Justice has elsewhere pointed out, "CIGA in effect spreads the loss among other insureds, in the form of increased costs to the insurance-buying public" (*Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 787 [244 Cal.Rptr. 655, 750 P.2d 297]), it is the millions of Californians who purchase insurance, not the insurance industry, and least of all reinsurers, who bear the costs of the sometimes meager benefits available from CIGA.

The majority effectively requires CIGA—that is, the insurance-buying public—to absorb the debts of an insolvent insurance company to its reinsurer, because setoff will result in CIGA having to pay all or a portion of claims that would otherwise have been satisfied by reinsurance payables. The Legislature clearly intended to prevent this. "CIGA is limited to the payment of 'covered claims' which are defined in relevant part as 'obligations of an insolvent insurer, . . . imposed by law and arising out of an insurance policy of the insolvent insurer . . . which were unpaid by the insolvent insurer . . . .' (Ins. Code, § 1063.1, subd. (c) (1).)" (*In re Imperial Ins. Co.* (1984) 157 Cal.App.3d 290, 293 [203 Cal.Rptr. 664], fn. omitted.) Subdivision (c)(3) of section 1063.1 states that " '[c]overed claims' *shall not include any obligations of the insolvent insurer arising out of any reinsurance contracts* . . . ." (Italics added.)

If there were any doubt about the Legislature's intent to insulate CIGA and consumers from liability for a primary insurer's obligations under a

---

[18]For a detailed description of CIGA, see Barger, *California Insurance Guarantee Association* (1970) 45 State Bar J. 475.

reinsurance contract, it is eliminated by section 1033. As earlier explained, subdivision (a)(5) of that statute explicitly provides that claims arising out of any reinsurance contract shall be excluded from the penultimate priority, thus placing them in the lowest priority. The setoff allowed by the majority will require the insurance buying public to bail out reinsurers, though the latter are in a far better position to assess the risk and protect themselves.

Moreover, entirely apart from the fact that CIGA's expenses are really borne by consumers, CIGA does not in any event wholly protect policyholders and injured claimants. The legislation creating guarantee associations places maximum limits on the amounts that can be paid out on a policy underwritten by an insolvent insurer.[19] CIGA will not pay an insured or an injured claimant amounts that exceed this ceiling. Amounts in excess of the ceiling can be recovered, if at all, only from the liquidator; and reinsurance is usually the most substantial asset available to the liquidator. (*Bluewater Ins. Ltd.* v. *Balzano, supra*, 823 P.2d at pp. 1367-1368; 1 Cal. Insurance Law & Practice, *supra*, § 11.06[1], p. 11-54; Nutter, *Insurer Insolvencies, Guaranty Funds, and Reinsurance Proceeds, supra*, 1979 Fed'n. of Ins. Couns. Q. at p. 373.)

The manner in which reinsurers escape payment of amounts over guarantee association ceilings has been described in the following way. "If a claimant settles with the guaranty association, she forfeits any possibility of obtaining an amount over the ceiling. The claimant's only alternative is to reject settlement, proceed to judgment and, if she wins, to collect the guaranty association compensation up to the ceiling and attempt to collect the balance from the liquidator. Claimants will rarely choose the latter alternative because they would be risking a defense verdict. Further, even if they were to win, claimants would likely have incurred significant litigation expenses and recover very little from the liquidator at some time in the distant future. Thus, even claimants with potential damages significantly higher than the ceiling will settle with the guaranty association. Such settlements cause paradoxical results: first, the injured claimant is not fully compensated; second, the reinsurers on the risk above the ceiling escape without paying anyone; third, the failure of the claimant to bring a claim in liquidation for amounts over the guaranty association ceiling deprives the liquidator, and therefore all of the general creditors, of reinsurance proceeds above the ceiling. In short, guaranty associations protect reinsurers and help

---

[19]CIGA only pays certain covered claims arising out of an insurance policy to a maximum of $500,000 per claim. (§ 1063.1, subd. (c)(1), (6).) The California Health Insurance Guaranty Association pays on covered policies to a maximum of $200,000 (adjusted for inflation as necessary) per injured person. (§ 1066.2, subd. (c).) The California Guaranty Life Insurance Association pays on covered policies to a maximum of $250,000 in life insurance death benefits for any one life. (§ 1067.02, subd. (c)(2).)

them receive a windfall. This peculiar result contradicts the purpose of statutory insolvency clauses, the purpose of guaranty associations and the goals of public policy in general." (Comment, *Reinsurance and Insurer Insolvency: The Problem of Direct Recovery By the Original Insured or Injured Claimant* (1982) 29 UCLA L.Rev. 872, 893-894, fns. omitted.)

As the Commissioner correctly contends, setoff contravenes the overarching purpose of the insurance laws: effectuating payment of policyholders' losses. There is no persuasive public policy or equitable reason to allow it in this case.

## IV.

The result the majority reaches is compelled neither by *Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323 [227 P.2d 484] (*Downey*), nor by any other controlling case. *Downey* did not involve a reinsurer or statutes analogous to those pertinent to this case; nor were the equities in *Downey* at all comparable to those of this case. *Downey* was an action by the liquidator of affiliated insurance companies against an agent to recover unremitted and unearned insurance premiums. The companies became insolvent on April 19, 1933. Prior to that date the defendant agent had issued policies on behalf of the companies and collected premiums from the policyholders which he did not remit. When he learned of the insolvencies, the agent "replaced all of the existing policies written in [the insolvent companies] by getting other companies 'to accept the coverage blanket' and within 15 days wrote new policies. He used the . . . [premium payments] he had on hand on April 19, 1933, and [additional payments] which he collected thereafter, in replacing the insurance." (*Id.,* at p. 329.)

The court permitted the agent to set off the amount of the premiums he collected on the basis of legal and equitable factors not present here. Setoff was approved in *Downey* because, among other things, "[t]he fact that the policyholders received their unearned premiums did not create an unlawful preference." (*Downey, supra,* 102 Cal.App.2d at p. 336.) As the court explained, an insurer has no right to an unearned premium in the first place. " 'A company cannot recover premiums for the portion of the term of insurance after insolvency has taken place. Nor can it maintain an action against an agent for the recovery of premiums received by him, the consideration for which has failed.' " (*Id.,* at p. 337, quoting *Johnson* v. *Button* (1917) 120 Va. 339 [91 S.E. 151, 153], in turn quoting 22 Cyc. 1404.) In *Downey* the policyholders' rights were legally superior to those of the liquidator and the insolvent companies and it was not unfair to allow them a

preference over other creditors. The setoff approved in the present case has the opposite effect: it defeats rights of policyholders and other creditors that are by statute superior to the competing rights of reinsurers.

It bears noting, finally, that, like *Downey, supra,* 102 Cal.App.2d 323, most of the cases the majority relies upon (e.g., *Carr* v. *Hamilton* (1889) 129 U.S. 252 [32 L.Ed. 669, 9 S.Ct. 295]; *Ainsworth* v. *Bank of California* (1897) 119 Cal. 470 [51 P. 952]; *Barnett Bank* v. *State, Dept. of Ins.* (Fla.Ct.App. 1987) 507 So.2d 142) are inapposite. While these cases articulate certain broad principles applicable to setoff generally, they do not shed light on the unusual statutory and equitable considerations peculiar to setoff under reciprocal reinsurance agreements and are therefore of limited use and not controlling. The opinions of the New York Court of Appeals in *Matter of Midland Ins. Co.* (1992) 79 N.Y.2d 253 [582 N.Y.S.2d 58, 590 N.E.2d 1186], and the Seventh Circuit in *Stamp* v. *Insurance Co. of North America, supra,* 908 F.2d 1375, which the majority relies upon most heavily, relate primarily to the esoteric issue of mutuality,[20] which is not central to the present case.

Though it does involve a reinsurer's right to setoff in connection with an insurance insolvency, *O'Connor* v. *Insurance Co. of North America, supra,* 622 F.Supp. 611 (*O'Connor*) does not deserve the weight assigned it by the majority. *O'Connor* permits a setoff it acknowledges will give the reinsurer priority over other creditors on the basis of the observation in Collier on Bankruptcy that the federal bankruptcy statute authorizing setoff contemplated that "one creditor may be getting paid more than other creditors." (*O'Connor, supra,* 622 F.Supp. at 619, citing 4 Collier on Bankruptcy (14th

---

[20]Whether a reinsurer's debts are "owed" prior to liquidation, and therefore mutual in time with the preliquidation debts of the reinsured, usually turns on whether a court believes the reinsurer's debts are sufficiently mature. Liquidators argue that such debts are contingent until insolvency occurs and payment compelled by an order of the liquidator or a court. Reinsurers, on the other hand, argue that temporal mutuality is satisfied because the event giving rise to the liability occurred upon the execution of the reinsurance agreement, prior to insolvency. The case law does not satisfactorily resolve the issue. Some courts have tended to deny setoff on the ground that the reinsurer's debt is unripe prior to actual insolvency. (See, e.g., *Melco System* v. *Receivers of Trans-America Ins. Co.* (1958) 268 Ala. 152 [105 So.2d 43].) Others have gone the other way. (See, e.g., *Stamp* v. *Insurance Co. of North America, supra,* 908 F.2d 1375, 1379-1380; *Matter of Midland Ins. Co., supra,* 590 N.E.2d 1186.) The issue is further clouded by the fact that the United States Supreme Court, which has never dispositively addressed the issue, has implied that because setoff is a fundamentally equitable matter, trial courts may have discretion to determine whether debts or credits are sufficiently mutual to allow setoff. (*Cumberland Glass Co.* v. *De Witt* (1915) 237 U.S. 447, 457 [59 L.Ed. 1042, 1046-1047, 35 S.Ct. 636]; see also *Melco System* v. *Receivers of Trans-America Ins. Co., supra,* 105 So.2d 43, 53; Schwab et al., *Onset of an Offset Revolution: The Application of Set-Offs in Insurance Insolvencies* (1990) 8 J. Ins. Reg. 464, 486.)

ed. 1978) ¶ 68.02[1].) Collier stated that the setting off of mutual debts does not amount to an invalid "preference." (*Ibid.*)[21] However, the same section of Collier emphasizes that, even as to claims that are undeniably mutual, setoff is never mandatory: "Its application . . . rests in the discretion of the court, exercised under the general principles of equity." (4 Collier on Bankruptcy (14th ed. 1978) ¶ 68.02[1], repeated in 4 Collier on Bankruptcy (15th ed. 1992) ¶ 553.02, p. 553-13.) Although *O'Connor* gives lip service to this guiding principle (622 F.Supp. at p. 616), the opinion does not even discuss the equities, let alone identify a single equitable reason to grant reinsurers priority over policyholders and other creditors. *O'Connor* proceeds on the unstated assumption, legally incorrect and illogical, that setoff must be allowed because it is permitted.

*O'Connor, supra*, 622 F.Supp. 611, is indifferent not only to the equities but also to the law relating to creditor priorities. The chief factor that usually determines the priority of a creditor's claim in the context of bankruptcy is whether his or her interest is secured or unsecured, a factor that is rarely significant in connection with insurance insolvencies. As between the claims of unsecured creditors, the Federal Bankruptcy Code is similar to section 1033, in that it divides claims into classes (eight), in descending order of priority. (11 U.S.C. § 507.) One of the most important features of the order of priorities established by the Bankruptcy Code, as Collier points out (3 Collier on Bankruptcy (15th ed. 1992) § 507.02[2] p. 507-11), is its exclusive nature. There is no judicial power to alter the statute. Despite the fact " 'that bankruptcy proceedings themselves are purely equitable in their character . . . [and] are to be administered in accord with the general principles and practices of equity[,]' . . . [t]he court may not by granting a priority which it deems equitable set aside the clear congressional mandate that no such priority shall be accorded. [Citation.]" (*In re Columbia Ribbon*

---

[21]The statement from Professor Collier's 1978 treatise that is the gravamen of the opinion in *O'Connor* is qualified in the most recent (1992) edition of that treatise by the observation "that the earlier setoff provision [since amended] is now considered to have been too broad. The result was that in too many cases, certain creditors received a preference to the detriment of other creditors and the debtor's estate. Consequently, [11 U.S.C. § 553, as amended] has restricted the right of setoff beyond what was done in earlier acts, and contains restrictions in some ways parallel to those found in the preference section [11 U.S.C. § 547]." (4 Collier on Bankruptcy (15th ed. 1992) ¶ 553.02, p. 553-10, fns. omitted.)

Collier's acknowledgment of the inequities that often result from setoff is mild compared to that of some other commentators. It has been persuasively contended that the allowance of setoff in the bankruptcy context is "unsound," inimical to " 'natural justice and equity' " and primarily reflects the "organized and powerful voice in legislative halls" of banks and other institutional creditors that benefit from the doctrine. (McCoid, *Setoff: Why Bankruptcy Priority?* (1989) 75 Va.L.Rev. 15, 43; see also, Note, *Setoff in Bankruptcy: Is the Creditor Preferred or Secured?* (1979) 50 U.Colo.L.Rev. 511 and Murray, *Banks versus Creditors of Their Customers: Set-Offs Against Customers' Accounts* (1977) 82 Com.L.J. 449.)

*Co.* (3d Cir. 1941) 117 F.2d 999, 1002.) "The theme of the Bankruptcy Act is 'equality of distribution' (*Sampsell* v. *Imperial Paper Corp.*, 313 U.S. 215, 219 [85 L.Ed. 1293, 1298, 61 S.Ct. 904]); and if one claimant is to be preferred over others, the purpose should be clear from the statute." (*Nathanson* v. *Labor Board* (1952) 344 U.S. 25, 29 [97 L.Ed. 23, 29, 73 S.Ct. 80].)

A setoff cannot be allowed that would have the effect of altering the priorities assigned the eight classes of creditors established under the Bankruptcy Code. Because "[t]he bankruptcy code attempts to ensure that all creditors similarly situated receive equal treatment" (*In re C-L Cartage Co., Inc.* (6th Cir. 1990) 899 F.2d 1490, 1492), it has been said that setoff is proper in the bankruptcy context only where "it does not disturb, but promotes, equality of distribution among creditors of the same class . . . ." (*Walker* v. *Wilkinson, supra,* 296 F. 850, 853, cert. den. 265 U.S. 596 [68 L.Ed. 1198, 44 S.Ct. 639].) If a federal court cannot use the federal setoff statute to alter priorities assigned creditors under the federal bankruptcy scheme, there certainly is no reason it should be permitted to use the doctrine to upset priorities established under a state regulatory scheme. That is, however, precisely what *O'Connor, supra,* 622 F.Supp. 611, accomplished, as a result of its complete indifference to the Illinois counterpart to section 1033 (Ill. Ins. Code, § 205; Ill.Rev.Stat. 1981, ch. 73, par. 817(1)), which the court did not even bother to cite.[22] It seems to me entirely inappropriate for this court to look for "guidance" to a federal trial judge completely lacking respect for governing state law.

The opinion in *O'Connor, supra,* 622 F.Supp. 611, justifies the determination of the Tenth Circuit that "whether or not [a state statute defining a reinsurer's right of offset] is applicable and what its provisions require are matters which are inseparably related to a state liquidation proceeding, and, as such, should not be decided in a federal court . . . ." (*Grimes* v. *Crown Life Ins. Co.* (10th Cir. 1988) 857 F.2d 699, 706, cert. den. 489 U.S. 1096 [103 L.Ed.2d 934, 109 S.Ct. 1568]; see also, *Corcoran* v. *Ardra Ins. Co., Ltd., supra,* 842 F.2d 31, 37.)

---

[22]Section 205 of the Illinois Insurance Code grants "[c]laims by policyholders, beneficiaries, insureds and liability claims against insureds" priority over "[a]ll other claims of general creditors . . . ." The Illinois Supreme Court has held that claims arising out of reinsurance contracts are claims of general creditors, and therefore subordinate to the claims of policyholders and injured claimants and others. (*In re Liquidations of Reserve Ins. Co., supra,* 122 Ill.2d 555 [524 N.E.2d 538].)

For the foregoing reasons, I would reverse the decision of the Court of Appeal.

Mosk, J., and Kennard, J., concurred.